# Washington *v.* The State.

## *Indictment for Murder.*

1. *Oath of petit jury.*—A recital in the judgment entry that the jury "were sworn and charged well and truly the issue joined to try, wherein the State of Alabama is plaintiff, and R. W., the prisoner at the bar, is defendant on trial, and a true verdict to render according to the evidence," sufficiently shows a substantial compliance with the requisitions of the statute (Code of 1876, § 4765) as to the oath to be administered to the jurors.

2. *Homicide perpetrated by firing pistol into dwelling-house, without specific intent to kill.*—Where the homicide was committed by firing a pistol, by night, through the window of a lighted room, in which four persons were sitting around the fire, the court may properly refuse to instruct the jury, on the request of the prisoner, that if he did not intend to kill or shoot at any of the inmates of the room, but merely intended to frighten them, he was not guilty of any higher offense than manslaughter in the second degree: such a charge, without qualification, or explanation, was calculated to mislead the jury, by withdrawing from their consideration the recklessness of the act, as showing a depraved mind regardless of human life (Code, § 4795), which might make the offense murder in the first degree.

FROM the Circuit Court of Hale.

Tried before Hon. GEO. H. CRAIG.

The prisoner in this case, Robert (or Barcus) Washington, was indicted for the murder of Beverly Willis, by shooting him with a pistol; was convicted of murder in the first degree, and sentenced to imprisonment in the penitentiary for life. On his trial, he reserved a bill of exceptions, which purports to set out all the evidence adduced. The shooting occurred on a Tuesday night in November, 1876, in the house of one Albert Jackson, who was a freedman, as were also the prisoner and the deceased; and the deceased died, from the effects of the wound, on the ensuing Thursday. The circumstances immediately connected with the killing, and the house in which it occurred, were thus stated and described by said Allen Jackson, who was examined as a witness for the State: "I was at my house that night. My wife and I, Bina Jackson, my niece, and Beverly Willis were sitting

around the fire-place, where there was a fire burning; and there was also a lamp burning on the mantel-piece. The house is from sixteen to eighteen feet square; the chimney is on the north end, and the door on the east side; there is a window opposite the door, on the west side, and a small window on the north side, next to, and on the west side of the chimney; in the west window, about one-third of one of the lower panes of glass is broken out, the opening being made transversely across the pane. I and Bina were sitting together on a box, on the east side of the fire-place, Beverly Willis in front of it, and my wife on the west side. While we were thus sitting there, between seven and eight o'clock at night, and Beverly was stooping down to tie his shoes, a pistol was fired through the west window, through the broken pane of glass. The sash and curtain were down. As soon as the pistol fired, Beverly rose up, and said, '*I am shot; Barcus shot me.*' He asked me to call Nat Collins, his brother-in-law, which I did, standing in the door. He went for the doctor when he came, and we laid Beverly down on the bed." The witness further testified: "I was present the next morning when the defendant came in to see Beverly. When he came in, Beverly held out his hand, and Barcus took it, and they shook hands. Defendant then sat down in a chair by the bed-side, and asked Beverly how he felt; and Beverly said he felt better than he did in the night. He then asked defendant what made him shoot him; and defendant replied: '*I know I shot you, Beverly, but I didn't aim to do it: I intended to shoot through the window, at the door opposite, to scare you all; I didn't aim to do it, and I am sorry for it.*'" The witness stated, also, that the deceased and the defendant had always been on friendly terms, and so declared to each other on that occasion; and that the defendant was a quiet and peaceable man, and was never before engaged in any difficulty so far as he knew.

Dr. Henly, the physician who was called in, was introduced as a witness on the part of the State and described the wound and its effects; and he further testified, as to what occurred when he visited the deceased on the morning after the shooting, as follows: "When I entered the house, the defendant was sitting near the deceased, and talking to him; and he moved, so as to allow me to get near the deceased. I asked the defendant, why he shot Beverly. He at first hesitated, and then said, '*I didn't intend to hurt Beverly when I fired the pistol.*' Prior to this, he had told Beverly, in my presence, that he had shot him, but did not intend to do it, and was sorry for it; and both said, that they had always been friendly, and had never had a cross word with each

other. Some twenty minutes after this, defendant said, '*I intended to shoot in the direction of the door.*' Beverly then said to him, '*Speak the truth ; come now, Barcus, you done owned it ; tell the truth about it ;*' to which the defendant made no reply. After the parties had been thus conversing for some time, the defendant left the bed-side, and sat down by the fire-place; and I then undertook to probe the wound. I found, somewhat to my surprise, that the wound appeared to range slightly upward ; and I turned to the defendant, and asked him, if he could show me the position of Beverly at the time of firing the pistol. He said, yes : that he was sitting in a chair, leaning over, tying his shoes ; and he then took a chair, at my suggestion, and showed me, by the position of his own body, how Beverly was sitting at the time. I told Beverly, when I first called to see him, that the wound was fatal, and that he would die from it in a short time."

Adam Page, also a freedman, and a witness for the State, testified that, on the night of the shooting, hearing the report of the pistol, and Allen Jackson calling, he started to go to said Jackson's house, and met a man on the road, whom he recognized as the defendant, running in the opposite direction ; that the man was in the same path that he was in, but turned out of it before meeting him ; that on the next morning, at the house of Nat Collins, where several persons were assembled, the defendant came up while they were talking, and said, " that he had shot Beverly with the pistol then in his hand, but it was an accident : that he did not intend to shoot him, but shot into the house to scare them ; " and that he then told witness, he was the man whom he had met running the night before. Nat Collins, another witness for the State, testified that, while going from the house of Allen Jackson on the night of the shooting, to summon the physician, " he saw a man running along the road in the same direction he was going ; that the man stopped, and sat down by the side of the road ; that, on coming up, he recognized him as the defendant, sitting there with his banjo in his hand; that he stopped, and asked him, '*Barcus, what made you shoot Beverly ?*' and he replied, '*I did not do it.*' Richard Collins, another witness for the State, who said that he was a "great uncle" of the defendant, and went, with others, to arrest him, early in the morning on the day after the shooting, testified that he asked the defendant, while under custody, why he shot Beverly ; and that he replied, "*I did not do it.*" Lewis Beverly, another witness for the State, who was also one of the arresting party, testified that, after the arrest, "while on the way, he heard defendant say he shot Beverly."

Bina Jackson was also introduced as a witness for the

[Washington v. The State.]

State, and testified, as to the position of the persons in the room when the pistol was fired, as Allen Jackson had testified ; also, that Beverly was in a line between her and the window, on the west; that the window was down, and the curtain drawn, and the pistol was fired through the opening in the broken pane of glass. "Witness testified, also, that there had been illicit intercourse between her and the defendant for several years ; that she had two children by him, and that he had promised to marry her, but had married another woman ; that he saw her a few days after his marriage, and told her that he loved her as well as ever ; that she told him he was married now, and must not talk so to her, and they then parted. She testified, also, that she went to preaching on the Sunday night before the shooting, at the house of Ben Muse on the Smaa place, and that Beverly Willis escorted her to and from church that night." Moses Marshall, another witness for the State, testified as follows : " I was at preaching at the house of Ben Muse, on the Smaa place, the night before Beverly was shot. I know Beverly, and I know the defendant. I saw them both at preaching that night. I was standing outside of the church, just before the close of the meeting, when Albert Jackson and his wife, and Bina Jackson and the defendant, came out, and started towards their homes. Beverly was walking by the side of Bina Jackson. Defendant and I were standing there at the passage-way, and we then went to the fodder-stack to cut a stick. I said to defendant, ' Let Beverly alone; he is a single man : you go along with your wife,' who was then in the church. Defendant said, ' Damned if he didn't want to see Beverly out to-night ; ' and he cut a stick from a cedar bush that was lying on the stack. That was all that was said, and me and him then turned and went back to the church." Ben Muse also testified, on the part of the State, that he saw the defendant and his wife at his house on the night of the preaching, but did not recollect seeing either Albert Jackson, or his wife, or Bina Jackson, or Beverly, on that occasion ; and that he saw Moses Marshall and the defendant coming back to the house, from the direction of the fodder-stack, about the close of the meeting.

On the part of the defendant, Maria Brown, who said that she was his sister, testified that there was "bad feeling" existing between him and the family of Moses Marshall, growing out of some "rent cotton" which the latter owed to the defendant ; and that the defendant had borrowed the pistol, a few days before the shooting, when about going over to the Marshalls' place to get the cotton. Nathan Taylor, another witness for the defendant, testified that, on the night the

shooting occurred, "there was a quilting and dance at the 'Val place,' about a quarter of a mile from the house of Albert Jackson; that defendant was at his house just after dark, about seven o'clock, and they went together to the 'Val place,' where defendant was to play for them, he being a banjo-player; that they went along together in good spirits, and full of fun; and that after they got there, and mingled in the crowd, he did not see the defendant again that night." This witness, and another also, testified that the defendant "was always full of fun and frolic and jokes;" and all of the witnesses, examined as to character, testified that he had always been quiet, peaceable, orderly, and kind.

"This being all the evidence, the court charged the jury, among other things, as follows: 'If the evidence satisfies the jury, beyond a reasonable doubt, that the defendant shot into the house where the deceased and several other persons were at the time, and that the defendant did the shooting willfully, and knowing at the time that the persons were in the room, then such shooting would be unlawful; and if it resulted in the death of Beverly Willis, and the act evidenced a depraved mind regardless of human life, although without any preconceived purpose to deprive any particular person of life, he would be guilty of murder in the first degree. If a person does an unlawful act, the law charges him with the knowledge of the probable consequences of such act. The jury may look to the fact that Beverly was killed, if it is shown, in connection with all the other evidence in the case, in determining whether or not the defendant, at the time, had such depraved mind as rendered him regardless of human life.'

"To the giving of this charge, and to each and every part thereof severally, and especially to the last clause, the defendant then and there excepted, and requested the court to give the following charges, which were in writing: '1. That if they believe, from the evidence, that the defendant, at the time he shot into the house, did not intend to shoot at Beverly Willis, or any of the parties present, but intended to shoot in the house merely to frighten the inmates, they can not convict him of manslaughter in the first degree.' '2. If the jury have any reasonable doubt, arising from the evidence, whether the defendant, at the time he shot into the house, shot at, or intended to shoot at, Beverly Willis or other occupants, or whether he only intended to shoot into the room to frighten the inmates, they must give him the benefit of that doubt, and acquit him of manslaughter in the first degree.' '3. If the jury believe, from the evidence, that the defendant fired the pistol into the house for the purpose

of frightening the inmates, and without aiming at, or intending to shoot any one, such action was an unlawful act, and a trespass ; and if in the prosecution of such unlawful trespass Beverly was accidentally killed, the defendant is responsible for the consequences of the unlawful trespass, and is guilty of manslaughter in the second degree.' ' 4. If the jury find, from all the evidence in the cause, that the following is a reasonable theory for the defense, growing out of the evidence : that the defendant fired a pistol into a room, which he knew to be occupied by four persons, without any design to do any personal injury to any of the occupants, but with the design simply to frighten them, and that death ensued, by accident, to one of the occupants, from such unlawful firing ; then it is the duty of the jury to convict the defendant of manslaughter in the second degree ; and upon the supposition that this hypothesis is reasonable, and arises naturally out of all the evidence, it is the duty of the jury to acquit the defendant of murder, and of manslaughter in the first degree.' The court refused each of these charges, and the defendant excepted to the refusal of each."

After conviction, the defendant moved in arrest of judgment, on the following (with other) grounds : " Because a proper *venire*, as required by law, was not served on him one entire day before the trial, in this : the court ordered fifty jurors, in addition to the regular jurors for the week, to be served on the prisoner ; Bud McCreary and William Shackleford were duly and regularly impanneled, sworn, and charged as regular jurors for said week, but were never served on the prisoner, nor were their names placed in the hat to be drawn out, nor were they in any way offered to the prisoner, nor was any opportunity whatever given to him to select them as jurors to try his case." The bill of exceptions sets out the motion in arrest of judgment, and then adds : "And the facts recited therein being proved, and the same being argued, and by the court understood, the said motion in arrest was overruled and denied ;" to which an exception was reserved by the prisoner. The judgment entry sets out the order of the court for a special *venire* and the service of a copy of it on the prisoner, the *venire* summoned by the sheriff, with his return, stating that he had served a list of the jurors, with a copy of the indictment, on the prisoner. The *venire*, as copied in the judgment entry, contains the names of eighty persons, thirty of whom are said to have belonged to the regular pannel for the week ; but the names of Bud McCreary and William Shackleford do not appear among them.

The judgment entry contains, also, the following recital as to the organization of the jury : " To each of said jurors,

[Washington v. The State.]

as drawn, the court propounded the questions required by
the statute (Rev. Code, § 4180), and caused each of said
jurors, as drawn and questioned, to be put upon the prisoner
for acceptance or challenge ; and the persons above named
having been accepted by the prisoner and the State, as the
jury to try said cause, the said jury, so impanneled as afore-
said, were sworn and charged well and truly the issue joined
to try, wherein the State of Alabama is plaintiff, and Robert
Washington, the prisoner at the bar, is defendant on trial,
and a true verdict to render according to the evidence."

A. A. COLEMAN, for the prisoner.

JOHN W. A. SANFORD, Attorney-General, for the State.

STONE, J.—The record disproves the assertion, that no
list of the jurors summoned for the trial of the prisoner was
served on him, as the law directs ; and we think the oath ad-
ministered to the jury, was, in every repect, full and com-
plete.   The statement of the record is, "And the said jury,
so impanneled as aforesaid, were sworn and charged well
and truly the issue joined to try, wherein the State of Ala-
bama is plaintiff, and Robert Washington, the prisoner at
the bar, is defendant on trial, and a true verdict to render
according to the evidence."   The word *sworn*, used in the
connection above, *ex vi termini* imports that they were sworn
according to the formula observed in our courts of justice ;
and the residue of the recital conforms substantially to the
statute.—Code of 1876, § 4765.

2.  "Every homicide,  .  .  .  perpetrated by any act
greatly dangerous to the lives of others, and evidencing a
depraved mind regardless of human life, although without
any preconceived purpose to deprive any particular person
of life, is murder in the first degree."—Code of 1876, § 4295.
The prisoner, in his confession, disclaimed any intention to
injure any one, and declared that his purpose was only to
frighten the inmates of the house.   For the purpose of con-
sidering this feature of the defense, apart from all others,
we leave out of view all evidence of motive, malice, or formed
design, as indicated by the prisoner's conduct at the preach-
ing on the Sunday night preceding, by his sudden flight from
the scene of his violence, and by the testimony of Bina Jack-
son.   On this question we confine ourselves to the manner
of the shooting itself, and to the proved position of the in-
mates of the house, at the time the pistol was fired.   If the
object was simply to frighten, why fire the pistol into the
house?   Why not fire it near the window, and pointed up-

ward, or from the house? The testimony is, that there were a burning fire and lighted lamp in the room. Then, why fire diagonally through the room, in the direction of where three of four inmates sat, near the fire, and not across the room, towards the door, which would have harmed no one? The light in the room enabled him to discern where the inmates sat. Then, why fire the pistol, directed in proper range towards one or more of them, if his object was only to frighten?

We have given expression to these reflections, not with any view of pronouncing on the facts. That is not for us. Our sole object is, that we may pronounce on the correctness of the charges asked and refused, in the light of the testimony before the jury. All the charges asked were properly refused, under the state of the proof before the jury. They were well calculated to mislead, by withholding from their consideration one of the most damaging tendencies of the testimony. They ignore, altogether, the reckless discharge of a loaded pistol, pointed, at short range, directly towards persons sitting quietly together, unconscious of danger; and the inference arising therefrom, of a depraved mind, regardless of human life. To have justified the giving of either of the charges, the jury should have been told that, to constitute such mitigation of the offense, it was necessary that there should be an absence of that depraved mind, which does not regard human life.—2 Whar. Cr. Law, §§ 965, 997. Sport does not usually employ such dangerous methods as were resorted to in this case; and before the jury are justified in inferring the less wicked motive, sought in the charges to be inferred, they should be affirmatively convinced that there was not the depraved mind, which the recklessness of the act tended to show.

The affirmative charge of the court is a correct exposition of the law.

The judgment of the court is affirmed.