# STATE v. RONALD LeROY STEEVES.

157 N. W. (2d) 67.

February 23, 1968—No. 39,280.

*Franklin Petri, Jr.,* for appellant.

*Douglas M. Head,* Attorney General, *George M. Scott,* County Attorney, and *David C. Weinberg,* Assistant County Attorney, for respondent.

FRANK T. GALLAGHER, JUSTICE.

This is an appeal from a judgment entered on a verdict returned against defendant, Ronald LeRoy Steeves, in Hennepin County District Court May 24, 1963. The jury found Steeves, a 19-year-old Minneapolis newspaper dispatcher, guilty of first-degree murder in the February 27, 1963, slaying of 15-year-old Mary Bell.

It appears from the record that defendant dropped out of Minneapolis South High during his ninth grade and, at the time of his arrest, was on parole from the St. Cloud Reformatory.[1] The record shows that defendant first met Pat (Patricia) Bell, Mary's 16-year-old sister, in July 1962; that they dated steadily for several months against the wishes of Pat's parents, who opposed the match because of differences in religion; that in November 1962 they drove to South Dakota, where they made an unsuccessful attempt to marry; and that Pat's father later forbade them to see one another. During the course of his dating Pat, defendant became well acquainted with Mary Bell. He and Pat "double-dated" with Mary and a boy friend, and on occasions defendant would consent to take Mary "practice driving."

Both Pat and Mary often "babysat" for Mrs. Margaret deVore, who worked nights as a hatcheck girl. On the night of the murder, Mrs. deVore had employed the girls to sit with her two children. Pat was to sit from 5 until 6:30 p. m., when Mary would relieve her. When Mary arrived at 6:30, she and Pat remained together in Mrs. deVore's apartment until 7:45, when Pat left to go home. Mrs. deVore testified

---

[1] Prior to the term at St. Cloud, defendant had served sentences in the juvenile correctional facilities at Glen Lake and Red Wing.

that she called her home, as she usually did, at 1 a. m. No one answered the phone. She called twice again before leaving work at 1:45, again with no response. When she arrived home, neither Mary nor Pat was there, though her children were safe and sleeping. Mrs. deVore noticed that the lock to a back door to her apartment was broken.

While walking his dog early the following morning, one Einar Nelson discovered Mary Bell's mutilated body lying in the snow in Minnehaha Park near the Ford Bridge in south Minneapolis.[2] About 11:30 that morning, February 28, police located defendant at South High School in Minneapolis.[3] He was arrested because of a close similarity between distinctive heel marks left in the snow where Mary's body was found and the kind of shoe he was wearing at the time. Later, the police determined that tire tracks near the scene of the crime could have been left by his car. Defendant does not dispute that there was probable cause for his arrest. The police took him to his home first where he could obtain clothing and his arrest could be explained to his father. He was then taken to the Minneapolis city jail and questioned throughout the afternoon and evening of February 28. At 7:30 that night, he signed the first of three statements; a second was signed at 10 the same night; a third, the one received in evidence at the trial (exhibit V), was signed the next day. Defendant admitted having lied in the first two statements. At the outset of each interrogation that culminated in a signed confession, defendant was informed of his right to counsel and his right to remain silent, and was warned that anything he said might be used against him at trial.[4]

As defendant relates the events of the night in his testimony, he

---

[2] The victim was stabbed 49 times in the back, 5 times in the front; she was beaten about the head with a blunt instrument; and her neck was split from her chin to beneath her right ear.

[3] Though defendant was no longer a student there, he often gave rides to and from school to Pat Bell and mutual friends.

[4] See statement taken March 1, 1963, by Detective O'Rourke, introduced and received as exhibit V.

had dinner with another girl friend and her mother, leaving them about 8 p. m. so that he could deliver newspapers to customers who had not received theirs. He stopped working before 9 p. m. because he was sick to his stomach, probably from pills he had taken.[5] He then went to the Flat Top Drive-In near the Minneapolis end of the Lake Street Bridge. His parole officer, David Lund, testified that defendant called him at 10 p. m.

According to defendant, he returned home shortly after using the telephone at a laundromat in south Minneapolis. He did not enter his house but sat on the front porch. At about 11:30 p. m., he took two 6-packs of beer, which had been on the floor of the porch, and drove to the east side of the Mississippi River near the Shriners Hospital, where he parked and drank several of the cans of beer. The next thing defendant remembers is that he was standing in the snow in Minnehaha Park over the body of a person whom he claims he did not recognize. In his hands he held a knife, and a tire iron was nearby. Next, according to his testimony, he threw the knife and tire iron away and then drove across the Ford Bridge, throwing one mitten out there, turning north along the St. Paul River Road and throwing out another blood-spattered mitten there.[6] He then returned to the Flat Top Drive-In, drank two more cans of beer, and eventually arrived at the Concord Motel in downtown Minneapolis. The motel register indicated that he took a room there at 3:20 a. m. February 28.

At 7:30 a. m., on February 28, defendant phoned Frances Zarembski, a mutual friend of Pat Bell and himself. Miss Zarembski told him that Mary Bell was missing and that Mary's father had asked the police to look for him. She also told him that he could find Pat in the dining hall at South High. Defendant left the motel, meet-

---

[5] Evidence indicates that Steeves had consumed various kinds of pills that day, including tranquilizers a doctor had prescribed for him and heart pills prescribed for his father.

[6] The police recovered a "chopper" mitten on the St. Paul side of the river, which was spotted with human blood and contained the inscription "Steeves."

ing Pat and other acquaintances at South High shortly after 8 a. m. He denied at that time knowing where Mary was. He then returned to the Concord Motel where he slept until 11:30 that morning. When he awoke, he drove back to South High and was arrested. Following the period of investigation mentioned above, an indictment of the grand jury was filed against defendant on March 5, 1963, and he was arraigned the next day.

Testimony at the trial revealed that before defendant was arraigned he was questioned for several hours and was twice taken out to the scene of the murder. During this period he made occasional refusals to say anything further to the police. Defense counsel stresses this in his brief. Perhaps the most emphatic refusal is the one testified to by Mrs. Agatha Mortenson, a police stenographer who was present during some of the questioning. In response to the prosecutor's question, Mrs. Mortenson stated:

"After a while Detective Blanch asked Mr. Steeves if he would give a statement now and he said, 'No, there is still enough [too much] publicity.' He said, 'I did it, I am responsible,' he said, 'there is nothing more necessary.' "

In his own testimony, defendant complained of the wooden bed in his jail cell and of being kept awake on the night of February 28 by several drunks housed in the same cell block. For its part, the prosecution brought out that defendant had purchased a knife the day before the murder for no apparent reason. It also drew from defendant the fact that the clothes he wore on the evening of the 27th and on the 28th of February were purchased new on the 27th; that there was no blood on these clothes prior to 11 p. m. on the 27th, but that they were blood-spattered on the morning of the 28th. Dr. John I. Coe, who performed the autopsy on Mary Bell and described in detail the condition of the body, said there was no sign of sexual trauma. There was evidence, however, to the effect that defendant and Pat Bell were concerned that Mary, who knew that her sister was continuing to see defendant against their father's wishes, might inform Mr. Bell of their meetings.

In the confession admitted into evidence, defendant recounts taking Mary Bell from the deVore apartment at knife point, driving with her about the Twin City metropolitan area for a time, and then bringing her to Minnehaha Park in south Minneapolis. He admits stabbing her there and, while she lay conscious on the ground, going to his car. According to one of the investigating officers defendant said that he then considered not killing her but decided to do so, reasoning that he would be sent to prison for what he had already done. In the confession defendant recounted returning to Mary, this time with the tire iron, and beating and "sticking" her until she died.

At the trial, the state presented defendant with his signed confession, which he was given time to read in court. The following questions were then asked:

"Q. [By the prosecutor] Now, Mr. Steeves, have you had an opportunity to review your statement?

"A. Yes, I have.

"Q. And is that your signature on the final page of the statement?

"A. Yes, it is.

"Q. Are those your initials on each page of the statement?

"A. Yes, they are.

"Q. And that is your statement?

"A. Yes, it is."

On appeal to this court, defendant raises the following issues: (1) Did the court err in admitting defendant's confession, state's exhibit V? (2) Did it err in not submitting first-degree manslaughter instructions to the jury? (3) Was there error in the admission of certain pictures of the victim in life and at the morgue? (4) Did it err in not excusing or, in the alternative, conducting a further voir dire examination of a juror about whom a question had been raised as to prejudice?

■ Defendant contends that the state's exhibit V, his third confession, was obtained by coercion and was therefore involuntary as a matter of law. Though it is not clearly articulated in defendant's brief, this claim seems to be based, first, upon the asserted failure

of the police officers to bring defendant promptly before a magistrate and, second, upon the alleged mistreatment of defendant while in custody. In asserting that the delay in his case was unreasonable, defendant cites Mallory v. United States, 354 U. S. 449, 77 S. Ct. 1356, 1 L. ed. (2d) 1479, which held that under the Federal Rules of Criminal Procedure a confession is inadmissible if obtained by police during a period of unnecessary delay before arraignment. It is well recognized that the purpose of requiring that a person under arrest be taken to a committing magistrate without unnecessary delay is to safeguard individual rights without hampering effective and intelligent law enforcement. 21 Am. Jur. (2d) Criminal Law, § 440. It is not disputed here that our statute with reference to procedure after a felony arrest requires reasonable promptness.[7] The state's position is that the delay in this case was not unreasonable.

From what evidence there is in the record on what occurred between defendant's arrest on February 28 and his indictment on March 5, we cannot say, as a matter of law, that the delay was unreasonable. Defendant was questioned for about 4 hours at police headquarters the afternoon of his arrest. In light of the seriousness of the crime under investigation, this does not seem excessive. Moreover, defendant's first and second statements, given at 7:30 and 10 that evening, contained alleged facts which required time-consuming corroboration.[8] At the same time, extensive investigation was under way in the State Crime Laboratory, where tire and heel prints were being analyzed, and blood on defendant's and deceased's clothing was being typed and compared.

---

[7] Minn. St. 629.46 provides: "When the offense charged in any warrant is punishable by imprisonment in the state prison, the officer making the arrest in some other county shall convey the prisoner to the county where the warrant issued, and take him before the magistrate who issued the same, or, in case of his inability to attend, before some other magistrate of the same county, and also deliver to such magistrate the warrant, with the proper return thereon signed by him."

[8] The police were given several false starts by defendant. First, he implicated one Richard Draves, then Pat Bell, both of whom were later cleared by police.

Defendant was advised of his right to counsel, his right to remain silent, and that anything he said could be used against him in court. There was no question of his being held incommunicado. In fact, the first place he was taken by the arresting officers was to his home where his arrest was explained to his father. On Monday, March 4, the grand jury convened, returning an indictment against defendant March 5. At trial, defendant did not suggest that his confession was not freely given.

The United States Supreme Court has said that the detention of defendant is only one in the totality of circumstances to be considered by courts in determining whether the confession was voluntary. Culombe v. Connecticut, 367 U. S. 568, 81 S. Ct. 1860, 6 L. ed. (2d) 1037. In a recent case where a 3-day delay in arraignment was unexplained, this court affirmed the conviction because there was neither evidence that the defendant's confession had been coerced nor doubt that he was guilty of the crime to which he confessed. State v. Housker, 273 Minn. 42, 139 N. W. (2d) 474. On the record before us, it cannot be said that defendant's detention before arraignment was unnecessary or unreasonable as a matter of law.

The second basis for defendant's claim that his confession was not voluntary is that his accommodations in the Hennepin County jail were uncomfortable. While evidence shows that his bed was an elevated wooden plank, that a hall light shone into his cell at night, and that the noises of jailed drunks made sleep difficult, if not impossible, there is no evidence of police misconduct or that defendant's will was overborne. He never testified that he was abused or coerced into confessing.

■    Defendant contends that his confession was involuntary. That issue was not developed at the trial. Defense counsel did not object to the confession as inadmissible because not voluntary.[9] He may have taken the view that its admission could not seriously damage his client's position since the theory of the defense in this case, as re-

---

[9] Police Detective O'Rourke testified that he took a statement from the defendant. After considerable questioning in connection with the taking of

vealed by the record, was not that defendant did not kill Mary Bell but that he did not intend to kill her. A recent decision of the United States Supreme Court would seem to apply here. In Henry v. Mississippi, 379 U. S. 443, 449, 85 S. Ct. 564, 568, 13 L. ed. (2d) 408, 414, the court said in part:

the statement and on other matters, and objections thereto, defense counsel stated: "We will object to the statement, Your Honor." The court sustained the objection. After some further questions by the prosecution with reference to the statement, which were objected to by the defense attorney as repetitious and leading, which objections were sustained by the court, the following appears in the record:

"Q. The statement that was given to you, Detective O'Rourke, was that given freely and voluntarily of his own accord?

"MR. PETRI: Objected to as calling for a conclusion.

"THE COURT: It may be, but he may answer it.

"THE WITNESS: Yes, it was. And the defendant—.

"THE COURT: You have answered it. Let's wait.

"Q. Were any threats or promises made to the defendant?

"A. None.

"MR. PETRI: Just a minute. I will ask that that be limited to this police officer, whether he heard—.

"THE COURT: He may answer that. Read the question back.

"(Last question and answer read by the reporter.)

"THE WITNESS: I made no threats or promises, no, sir.

"MR. DURDA: *Your Honor, we reoffer State's Exhibit V at this time.*

"MR. PETRI: *We make the same objection.*

"THE COURT: *Overruled. Received.*" (Italics supplied.)

The present case is thus distinguishable from Jackson v. Denno, 378 U. S. 368, 84 S. Ct. 1774, 12 L. ed. (2d) 908, where the issue of the voluntariness of defendant's confession surfaced in an exchange between court and counsel over the fact that defendant, who had been wounded, at the time he confessed had been under the influence of drugs given him by a doctor. Furthermore, this state requires that counsel specify on what ground he is basing an objection so that the trial court may rule on it intelligently and the adverse party may remove it with other evidence. 19 Dunnell, Dig. (3 ed.) § 9739. Where counsel frames his objection in language such as "objected to, same as above," the trial court is justified in treating the objection as based upon the same ground as the preceding one. State v. Hyde, 27 Minn. 153, 155, 6 N. W. 555, 556.

"We have no reason * * * to express any view on the merits of petitioner's substantial constitutional claim. For even assuming that the making of the objection of the motion for a directed verdict satisfied the state interest served by the contemporaneous-objection rule, the record suggests a possibility that petitioner's counsel deliberately bypassed the opportunity to make timely objection in the state court, and thus that the petitioner should be deemed to have forfeited his state court remedies."

If there is evidence that defendant's confession was involuntary, it does not appear in the record presented to this court. Indeed, every indication is that the confession was voluntarily given. On this record we must hold that defendant was not denied his constitutional rights and that the trial court did not err in admitting the confession. Should there exist evidence that defendant was denied any of his constitutional rights, his remedy lies in the postconviction procedure provided by Minn. St. 590.01 (L. 1967, c. 336, § 1).

■ Defendant also assigns as error the trial court's refusal to include in his charge to the jury first-degree manslaughter instructions. We said in State v. Damuth, 135 Minn. 76, 79, 160 N. W. 196, 198, that "[w]here the evidence does not reasonably tend to reduce the crime charged to a lesser degree, the court may properly decline a request to charge as to such lesser degree." Minn. St. 1961, § 619.15, in effect at the time of the crime, provided that a homicide is "manslaughter in the first degree when committed without a design to effect death." Where the victim has been stabbed 5 times in the chest and abdomen, 49 times in the back, her throat has been slit from ear to chin, and she had been bludgeoned over the head with a tire iron, one might well conclude that her assailant did not deal with her "without a design to effect death." Besides, according to one of the investigating officers, defendant said that after first stabbing Mary Bell he retreated to his car where he considered not killing her. Deciding that he would be imprisoned for what he had already done, however, he went back to her, this time with the tire iron.

Considering the condition of Mary Bell's body and this testimony of defendant's admission of deliberation, we cannot say that the evidence reasonably tended "to reduce the crime charged" from murder to manslaughter. The trial court properly denied defendant's motion to include manslaughter instructions in the jury charge.

■ Defendant raises two other issues. One is whether the trial court erred in admitting into evidence several photographs showing the deceased lying on a table in the morgue. The photographs were in color and, taken from various angles, revealed every wound inflicted on her. Defendant argues that these photographs were immaterial and "contributed nothing but passion and prejudice in the minds of the jury." The state answers that "[t]hese photographs helped to conclusively establish the factors of premeditation, intent and design [to kill]."

The general rule regarding the admission of demonstrative evidence is that, if it tends to prove a material issue, it is admissible whether or not it incites the jury to passion and prejudice. In State v. DeZeler, 230 Minn. 39, 46, 41 N. W. (2d) 313, 319, 15 A. L. R. (2d) 1137, 1147, this court addressed itself to the question of the admissibility of photographs in a murder trial:

"* * * Photographs are admissible as competent evidence where they *accurately* portray anything which it is competent for a witness to describe in words, or where they are helpful as an aid to a verbal description of objects and conditions, provided they are relevant to some material issue; and they are not rendered inadmissible merely because they vividly bring to jurors the details of a shocking crime or incidentally tend to arouse passion or prejudice. This is the general rule, and any other would be an anachronism in this day where pictures are a common and recognized medium for the accurate portrayal of objects and events."

In the present case, Dr. John I. Coe testified as to the cause of Mary's death, describing in clinical detail the condition of her body. After having heard that description, it is hard to imagine that the

jury could have been very much more horrified or impassioned by the sight of the photographs, gruesome as they were. But neither could they have added much to the jury's knowledge. It is difficult to see, in light of Dr. Coe's thorough testimony, what real probative value the photographs had. Since they do meet the minimal qualifications set out in State v. DeZeler, *supra,* we cannot say that the trial court abused its discretion in admitting them. We agree, however, with the observation of the California court that the prosecution is not to be commended for offering in evidence "relevant but unnecessary" photographs of a murder victim. See, People v. Cavanaugh, 44 Cal. (2d) 252, 282 P. (2d) 53.

■ Finally, defendant asserts as error the trial court's refusal to act upon an anonymous phone call by which, allegedly, the objectivity of a juror was challenged.

At one point during the trial, defense counsel informed the court that his secretary had received an anonymous phone call suggesting that one of the jurors worked with defendant's mother, had discussed the case with her, and was prejudiced. Although the prosecutor expressed strong hopes that the court would look into the matter immediately, defense counsel acquiesced in the court's decision to ignore the call. According to the record, at the conclusion of the defendant's case and the state's rebuttal, counsel for defense requested that the court remove the juror who had been referred to by his secretary earlier in the trial, which request was denied. Defense counsel then stated, "Then in order to protect the record a little further I would ask the court to conduct a further voir dire examination of the juror in the Chambers." This request was denied. No factual evidence or data was offered to give the trial court grounds to grant the motion so we have nothing on which to base an opinion that the trial court erred in denying it. We stated in State v. DeZeler, 230 Minn. 39, 50, 41 N. W. (2d) 313, 321, 15 A. L. R. (2d) 1137, 1149:

"* * * As an essential of a fair and impartial trial, there is no presumption that the jury is likely to take advantage of every opportunity to disregard the cautionary instructions of the court. * * *

"* * * Whether there has been a communication with the jury and whether it has caused prejudice are fact questions to be determined by the trial court in the exercise of sound discretion. [Citations omitted.]"

Under the circumstances of the present case, where the juror had undergone a thorough voir dire examination, we cannot say that the trial judge abused his discretion in choosing to ignore the alleged telephone call.

Affirmed.