# STATE v. VERNON DARRELL HANSON.

167 N. W. (2d) 607.

March 20, 1970—No. 40037.

318

*Whitney E. Tarutis,* and *Vernon Darrell Hanson,* pro se, for appellant.

*Douglas M. Head,* Attorney General, *Darrell C. Hill,* Special Assistant Attorney General, and *Keith C. Davison,* Assistant County Attorney, for respondent.

Heard before Knutson, C. J., and Sheran, Peterson, Frank T. Gallagher, and Theodore B. Knudson, JJ.

SHERAN, JUSTICE.

Appeal from a judgment of conviction for the crime of murder in the second degree.

On October 6, 1964, at about 4 p. m., defendant, Vernon Hanson, shot and killed his wife, Rosella, at Browns Valley, Traverse County, Minnesota. The weapon used was a .22-caliber rifle which was found to contain 13 rounds of .22 "longs" after the fatal shot had been fired. When the gun was fired by Hanson, he was standing in the yard adjacent to a house owned by Donald Nickolauson of Browns Valley. Mrs. Hanson at that moment was at the kitchen doorway of the house. She fell prone, her face coming to rest on the kitchen floor, her feet extending to the sill of the doorway. The bullet which caused her death penetrated the skull and brain from a point just behind her right ear. When shot, Mrs. Hanson had a .22-caliber revolver in her right hand.

Indicted for murder in the first degree, defendant claimed justification in that he acted in self-defense. The trial court submitted the case to a jury with instructions that under the evidence defendant could be found not guilty, guilty of murder in the first degree as charged, or, as lesser and included offenses, murder in the second degree or manslaughter. Defendant was found guilty of murder in the second degree.

## ISSUES

On this appeal, so long delayed in part at least because of disagreement as to defendant's claim of indigence, it is contended that the judgment of conviction should be reversed on the following grounds:

(1) The evidence is inadequate to show that the killing was intended and unjustified.

(2) The trial court erred in failing to submit third degree murder as a lesser and included offense.

(3) Reference by the prosecution in closing argument to the Fifth Commandment was an appeal to passion and prejudice.

(4) The voluntariness of statements made by defendant and

received in evidence (state's exhibits A and B) was not adequately established.

(5) Defendant was not afforded his right to trial by an impartial jury.

(6) Sequestered witnesses were permitted to engage in conversation concerning their testimony.

At oral argument, it was urged:

(7) The trial judge, called upon to determine the admissibility of state's exhibits A and B (the statements executed by defendant after the killing), decided that the exhibits were *not inadmissible as a matter of law* and failed to decide that the statements were in fact voluntary, as required by Jackson v. Denno, 378 U. S. 368, 84 S. Ct. 1774, 12 L. ed. (2d) 908.

In addition, by supplemental brief filed pro se by defendant, it is claimed:

(8) State's exhibit A was secured as a result of an illegal search and seizure.

(9) State's exhibit A should not have been received because no copy of it was given to defendant as is required by Minn. St. 611.033.

(10) The state failed to produce evidence in its possession favorable to the defendant on the issue of self-defense.

(11) Witnesses for the state gave testimony which was demonstrably false.

## FACTS

The following facts, though not essential to the resolution of the issues on appeal, may help in putting our decision in a practical context.

Defendant was born October 6, 1932, on a farm near Sisseton, South Dakota, where he received schooling through the eighth grade. On June 6, 1958, he married Rosella Egan, the daughter of William Egan, who also lived near Sisseton. By 1964, their family consisted of 4 children, the oldest of whom was a boy,

Dennis, then about 6 years of age. Defendant owned an 80-acre farm near Bruno, Pine County, Minnesota, purchased in 1957, which apparently served as the family home. In addition to farm work, defendant through the years obtained industrial employment, sometimes in the Twin Cities area, and when this was the case, he secured living accommodations near his place of employment. On occasion, defendant's wife also worked for wages.

The events leading to the killing began on June 21, 1964, when Vernon Hanson beat his wife Rosella severely. His explanation: She admitted an affair with another man whom she had met while temporarily employed in St. Paul. The Hansons were then living in St. Paul. So severe was this beating that Rosella required hospital care for about one week. Notwithstanding this, Hanson and his wife were living together at Bruno in September 1964. There, on September 23, defendant again beat his wife in a brutal way. His explanation: She had made a tantalizing reference to the affair which had ended 3 months before. As a result of this beating, defendant was apparently subject to criminal charges in Pine County as of October 6, 1964, the day Rosella was shot.

Still suffering the effects of this last assault, Rosella went to Browns Valley to stay with her sister, Mrs. Verna Nickolauson, who lived there with her husband and children. Vernon Hanson went to St. Paul where he stayed with his brothers. Browns Valley is about 175 miles northwest of the Twin Cities and about 20 miles southeast of Sisseton, South Dakota. Bruno is about 80 miles north of the Twin Cities and almost 200 miles northeast of Browns Valley.

On Saturday, October 3, 1964, defendant came to the Nickolauson home in Browns Valley seeking a reconciliation with his wife. They discussed their problems for several hours but nothing was settled. Vernon went back to St. Paul; Rosella remained.

On Monday, October 5, Vernon appeared at the Nickolauson home again. Between the time he arrived at about 3 p. m. and

2 a. m. the following morning, it appears that defendant was treated amiably considering the circumstances. He not only conversed with his wife but also with his sister-in-law, Verna Nickolauson, and with his father-in-law, William Egan. To some extent, at least, he participated in a birthday celebration for one of the Nickolauson children. He and his wife discussed at great length the possible resumption of their marriage relationship. There is evidence that Rosella Hanson was fearful that reunion with her husband might lead to another beating. In fact, defendant testified that his wife told him that she had thought of killing him, after the last beating and would do so should this ever occur again. Although defendant pleaded that they forgive and forget for his sake and that of the children, they parted that night with nothing settled definitely.

After leaving the Nickolausons, defendant drove his car to Sisseton where he spent the night, sleeping late Tuesday, October 6. For reasons not clearly explained, he decided at that point to exchange a single-shot rifle which he had brought with him from St. Paul for a .22-caliber automatic rifle purchased at a pawn shop in Sisseton. He also purchased a box of .22 "shorts" at Sisseton, being uncertain, he said, whether bullets of this size would work better in the newly acquired gun than .22 "longs," some of which he had brought with him.

Before returning to Browns Valley at about 3 p. m. on October 6, defendant stopped long enough en route to be certain that the gun was working and then loaded it with .22 long bullets. His explanation: He had resolved to kill himself if his wife again rejected him. In support of this explanation, defendant offered at trial a note, which he had prepared in Sisseton and which he intended to deliver to his wife, expressing his willingness to seek the aid of a priest in an effort to rehabilitate the marriage and a suicide note, prepared for use should this proposal prove unavailing. The loaded automatic rifle was in the car, either in the unlocked trunk or the back seat, when defendant reached the Nickolauson home.

Apparently William Egan and his daughters, Verna and Rosella, had decided to drive to Sisseton that day to visit another daughter. The conversation between Vernon and Rosella occurring in the Nickolauson home between 3 and 4 p. m. that day seemed not to be progressing very well. Defendant left the house and went into his car. There he talked with his boy, Dennis, for about 15 minutes when Rosella, distressed, came out of the house expressing her concern that Vernon was planning to separate her from her son. Defendant apparently denied this and took the occasion to give his wife the written promise of reform which he had prepared in Sisseton. She took and read the note but refused to talk with him further. In fact, defendant testified, she remained unmoved even though he told her that he would kill himself if she refused to come back to him. Instead, she returned to the house in what defendant considered to be an angry mood.

At this stage, defendant claimed, he became apprehensive that Rosella was going to get a gun he had previously observed in the kitchen and use it against him. Whether out of fear or, as he testified at one point, to prove that his threat of suicide was in earnest, Vernon placed the .22 rifle on the front floorboard of the car in which he was sitting. In the meantime, Rosella, who had returned to the house, and her sister were being urged by their father to prepare to leave for Sisseton. This apparently prompted Rosella to return to the car once again, saying, according to defendant, "I want Dennis. We're going to Delores's place." If this was Rosella's wish, it was unrealized because she left the car without the boy and headed (on the run, defendant claims) for the house. Mrs. Nickolauson, who was outside at the time, testified that at about this point she had heard Rosella say, "I've had enough of you." Defendant, whether out of concern that his wife would get a gun and shoot him, as he claims, or for some other reason, followed her into the Nickolauson kitchen where he took a pellet gun from her which she had taken from above the kitchen doorway. Returning to his car, he resisted an attempt by Mrs. Nickolauson to take the pellet gun from him and

then threw it on the ground. He remained in possession of the .22 rifle.

Then followed the events which, imperfectly recollected by the witnesses, precipitated the fatal shot. Defendant claims that as he stood in the yard near his car (a distance of about 75 feet from the house), his wife came through the kitchen door and stood on the steps leading to the ground and aimed the revolver at him. At the same moment, he testified, Mrs. Nickolauson, standing in the yard about 2 feet from the house and about 8 feet from the steps, was pointing a "rifle" at him. The "rifle" may have been the pellet gun; but this testimony of defendant has no corroboration whatever. Defendant moved a .22 "long" from the magazine of his gun into the firing chamber, "pulled up," and fired. Mrs. Nickolauson testified that when she heard defendant's gun "click" (presumably at the instant when defendant moved the shell into the gun's chamber) she lifted her head; looked toward Rosella; and noticed that by then Rosella had turned her back to Vernon and was headed for the kitchen into which she fell when Vernon fired. In spite of the fact that the bullet fired from his gun pierced Rosella's skull immediately behind the right ear, the testimony given by defendant was that he aimed somewhere in between the two sisters and did not intend to shoot his wife.

Although the defendant did not leave the vicinity of the killing after it occurred, his arrest was delayed because, still in possession of the .22 automatic, he was threatening to commit suicide. A Browns Valley police officer, the county sheriff, and the county coroner, who came to the Nickolauson house, were finally able to persuade defendant to give up the gun. He was then placed in confinement, first at Browns Valley and later in the county jail.

Between the time of the killing and the time that defendant surrendered his gun and submitted to arrest (about 2 hours), on his own initiative he prepared a written statement (state's exhibit A) intended to serve as an explanation of his reason for

killing his wife. He announced that he was putting the statement in the car so that the officers present could obtain and read his explanation.

Jailed in Browns Valley at about 7 p. m., defendant executed a typed statement setting out the facts of the killing at about 11 p. m. He also added a notation in his own handwriting supplementing or amending the typed statement. Defendant was given a copy of this statement, state's exhibit B, at the time but was not provided with a copy of the statement taken from his car, state's exhibit A, until the time of trial.

## DECISION

After consideration of defendant's claims of error, we hold that the judgment of conviction must be affirmed for the reasons now to be stated.

### ADEQUACY OF EVIDENCE

■ The evidence is overwhelming that the killing was intentional. The course of the fatal bullet in and of itself lends strong support to a finding of purposeful homicide.[1]

The fact that defendant came to the Nickolauson home armed with a loaded automatic rifle bolsters this inference. The beatings of June 21 and September 28, 1964, disclose a violent attitude on defendant's part in relation to his wife.[2] A letter written by defendant to his wife confirms this attitude. Defendant's claim that he shot his wife in order to avoid death or grievous bodily harm when he observed her at the kitchen doorway of the Nickolauson home, gun in hand, is in itself inconsistent with the theory that the shooting was inadvertent or accidental.

It is true that the conversations between defendant and his wife on Saturday, October 3, and again on Monday, October 5, were in a conciliatory vein and that defendant made no threat

---

[1] State v. Hare, 278 Minn. 405, 154 N. W. (2d) 820, certiorari denied, 391 U. S. 925, 88 S. Ct. 1823, 20 L. ed. (2d) 663; State v. Ware, 267 Minn. 191, 126 N. W. (2d) 429; State v. Towers, 106 Minn. 105, 118 N. W. 361.

[2] See, State v. Rediker, 214 Minn. 470, 8 N. W. (2d) 527.

of violence to his wife on either of these occasions. It is also true that defendant and his wife engaged in conversation in the Nickolauson house shortly before the killing and there was at that time no intimation by defendant of any purpose to injure her.

Moreover, the evidence strongly supports defendant's claim that the primary purpose of his visits of October 3, October 5, and October 6 was to persuade his wife to live again with him in the relationship of husband and wife upon his promise that he would never strike her again. The testimony of defendant is corroborated in this respect by that of Rosella Hanson's sister, Verna Nickolauson, and William Egan, their father, who were present in the house during these visits and overheard conversations between the deceased and defendant indicating his attachment to his wife and their children. It is accepted as a fact that during these conversations defendant told his wife that he did not care to live separated from her and the children and that if a reconciliation were not achieved, he would kill himself. But these circumstances, however persuasive of the fact that defendant loved his wife and the children, do not establish the absence of intent to kill as a matter of law.

If defendant had intended to kill only himself on Tuesday, October 6, 1964, when he came to the Nickolauson house, it is difficult if not impossible to understand why earlier that day he had exchanged the single-shot rifle for the .22 automatic with which Rosella Hanson was shot. If it be true, as defendant claims, that he secured the automatic rifle only for use as a suicide instrument in the event his wife rejected what was to be a final plea for reconciliation, his reason for loading the weapon with 15 rounds of .22 "long" bullets before reaching the Nickolauson house on this fatal day seems, at best, obscure.

After the policeman, sheriff, and coroner arrived at the scene, defendant tendered to them the statement which he had written immediately after the killing describing what he had done and the reasons for it. In this statement, which was received in evi-

dence, there is nothing to suggest that the homicide was unintended.

Finally, the fact that defendant, who remained at or near the Nickolauson yard after the shooting, threatened repeatedly to shoot himself in the head and was deterred from doing so only by the remonstrations of the investigating officials bespeaks as much a sense of guilt as it does an exclusively suicidal purpose in the procurement of the .22 automatic rifle.

The evidence strongly supports the inference that defendant on the day of the shooting suffered from the knowledge of his wife's past misconduct and resented it. But the passions aroused by past infidelity, in the absence of proof of legal insanity, do not justify homicide.

We have noted defendant's testimony to the effect that he shot his wife only because she was, at the moment he fired the .22 automatic, aiming a revolver at him. Had the jury believed this to be the fact, had they believed that this situation had not been provoked by the defendant, and had they concluded that defendant fired his weapon in a reasonably necessary effort to avoid death or grievous bodily harm, they could have concluded that the killing was justified as a reasonable exercise of the right of self-defense. But it cannot possibly be said that the evidence compels such a finding. On the contrary, there is very persuasive evidence to the effect that defendant shot his wife when she had turned away from him and was in the process of reentering the kitchen of the Nickolauson house. The evidence which supports, if it does not compel, this inference includes the fact that the fatal bullet struck her behind the right ear and the circumstance that she then fell face forward into the kitchen and away from the place outside of the house where defendant was standing when he fired.

Defendant in his pro se brief calls attention to evidence indicating the possibility that his wife may have attempted futilely to fire the revolver and that she had turned to retreat when the gun failed to fire, a circumstance which could conceivably ac-

count for the fact that she was reentering the house when the bullet struck her. But such evidence as there is in support of this contention has been assessed by the jury in light of the instructions of the trial judge and we cannot say that it was adequate to dispel a reasonable certainty of defendant's guilt of murder in the second degree. Generally, a person does not act in self-defense when he shoots another from the rear. State v. Dubestein, 136 Minn. 325, 162 N. W. 358.

### THIRD-DEGREE MURDER

■ Defendant's counsel requested the trial court to submit a verdict of murder in the third degree as a lesser offense included in the indictment for murder in the first degree. This request was denied, and, in this connection, the record discloses the following:

"THE COURT: * * * Let the record show that the defendant has asked for the submission of murder in the third degree. Do you have any objection to my submitting manslaughter in the first degree, or do you want to rest on murder in the first, second and third degrees?

"MR. SCANLON [Defendant's trial counsel]: No, we have no objection to your submitting manslaughter in the first degree.

\* \* \* \* \*

"THE COURT: Very well. I'll deny your request to submit third degree murder, but I'll grant your request to submit murder in the first, second, and manslaughter in the first degree, subdivision 1."

We do not regard this colloquy between court and counsel as a waiver of defendant's request.

It is our opinion, however, that the evidence in this case would not have justified a finding of guilty of murder in the third degree. It is an essential element of that offense that death be caused by "an act eminently dangerous to others and evincing a depraved mind, regardless of human life." The offense as de-

fined by Minn. St. 609.195[3] occurs only where death is caused "without intent to effect the death of any person," a phrase which under our decisions excludes a situation where the animus of defendant is directed toward one person only. The crime of murder in the third degree is committed only in situations "where the reckless, mischievous, or wanton acts of the accused were committed without special regard to their effect on any particular person or persons, but were committed with a reckless disregard of whether they injured one person or another." State v. Lowe, 66 Minn. 296, 298, 68 N. W. 1094, 1095. See, State v. Dahlstrom, 276 Minn. 301, 150 N. W. (2d) 53; State v. Kopetka, 265 Minn. 371, 121 N. W. (2d) 783; State v. Shepard, 171 Minn. 414, 214 N. W. 280; State v. Weltz, 155 Minn. 143, 193 N. W. 42. We have concluded that the evidence in this case did not entitle defendant to an instruction that the jury could find him guilty of murder in the third degree as a lesser and included offense.

## PROSECUTOR'S ARGUMENT

■ The reference by the prosecution in his closing argument to the words of the Fifth Commandment, "Thou shalt not kill," was, at best, inappropriate. The jury in this case was not assembled to pass a moral judgment on the defendant. Its obligation was to decide whether on the evidence legally adduced in the courtroom the state had established beyond a reasonable doubt defendant's guilt of homicide as defined by our statutes. Nothing can be added to what was said in State v. Wangberg, 272 Minn. 204, 136 N. W. (2d) 853, concerning the mischief which results when jurors are urged to apply sanctions for the enforcement of divine law. Their role is limited to that of judg-

---

[3] Minn. St. 609.195 provides in part: "Whoever, without intent to effect the death of any person, causes the death of another by either of the following means, is guilty of murder in the third degree and may be sentenced to imprisonment for not more than 25 years:

"(1) Perpetrates an act eminently dangerous to others and evincing a depraved mind, regardless of human life * * *."

ing whether guilt of man-made criminal law is proved by evidence properly received.

Nevertheless, having examined the entire argument of the prosecuting attorney in light of the opinion of this court in State v. Wangberg, *supra,* we have concluded that it does not constitute a prejudicially erroneous appeal to bias and prejudice. The plea, limited to approximately 1500 words, considered as a whole, was temperate. For the most part it was an objective analysis of the evidence. The reference to the Fifth Commandment was very much incidental to its main thrust. We do not consider it a basis for reversal.

## CONFESSIONS

■ The trial judge, informed that the prosecuting attorney intended to offer in evidence as state's exhibits A and B the statements executed by defendant with respect to the killing, conducted a hearing in chambers directed to the question of whether these statements were involuntarily given and should therefore be rejected from evidence.

It was established at this hearing that state's exhibit A was a statement written by defendant at the scene of the crime on his own initiative and before he was questioned by the law-enforcement officials who investigated the case. Having written this statement himself and signed it, defendant placed it in his automobile and, without being prompted to do so, instructed the investigating officers to read it. They did so and preserved this statement for use as evidence in the case.

State's exhibit B was a statement given by defendant to police officers at approximately 11 p. m. on October 6, 1964, about 4 hours after defendant was taken into custody and while he was being confined in the Browns Valley jail. Although the evidence offered in support of the voluntariness of this statement fails to show that a Miranda warning was given before the statement was taken, the formalities required by that decision do not apply with respect to trials conducted before its effective date, i. e.,

June 13, 1966.[4] This being so, the trial judge was entitled to consider the totality of circumstances in making his decision as to the voluntary character of state's exhibits A and B. See, State ex rel. Rasmussen v. Tahash, 272 Minn. 539, 141 N. W. (2d) 3.

As to state's exhibit A, it is abundantly clear that defendant wrote and signed it without any compulsion whatever attributable to law-enforcement officers. He prepared the statement on his own initiative and urged that it be read so that the reasons why he had killed his wife would be understood.[5]

A different situation exists with respect to state's exhibit B in the sense that it was obtained by the law-enforcement officials from defendant after he was taken into custody and as a result of custodial interrogation. The circumstances relative to the voluntary character of this conversation as set out in the record and disclosed to the trial judge in the hearing conducted in his chambers were more than adequate to support a factfinding of voluntariness.[6]

## JURY

The claim that defendant was not afforded his right to trial by an impartial jury is without merit. It is conceded that one of the jurors who sat on the case was a cousin of the sheriff. Another was remotely related to him by marriage. As could be expected in a rural county, some of the jurors had past business associations with the county attorney. But these facts were or could have been disclosed upon voir dire. For reasons which we must presume to have been adequate, the right to eliminate these jurors through a challenge for cause or by exercise of a peremptory challenge was not exercised. To say now that the makeup

---

[4] See, Miranda v. Arizona, 384 U. S. 436, 86 S. Ct. 1602, 16 L. ed. (2d) 694; Johnson v. New Jersey, 384 U. S. 719, 86 S. Ct. 1772, 16 L. ed. (2d) 882.

[5] See, Wong Sun v. United States, 371 U. S. 471, 83 S. Ct. 407, 9 L. ed. (2d) 441.

[6] See, State v. Doust, 285 Minn. 336, 173 N. W. (2d) 337; State v. Steeves, 279 Minn. 298, 157 N. W. (2d) 67.

of the jury voided the trial is not persuasive. See, State v. Thieme, 281 Minn. 47, 160 N. W. (2d) 396.

### CONDUCT OF SEQUESTERED WITNESS

■ At the commencement of the trial defendant's motion that witnesses be sequestered was granted. The testimony of each witness pertaining to exhibits A and B was taken separately in the judge's chambers. After testifying, the sheriff talked to the coroner about his experience before the latter was called. This was improper. Even so, there is nothing in this record to suggest that the conversation between the sheriff and the other witness at a time when the admission of confessions was being considered by the court in chambers affected the case in such a way as to cause prejudicial error.[7]

### JACKSON-DENNO HEARING

■ It is not entirely clear from this record whether the trial judge ruled on the admissibility of state's exhibits A and B in conformity with requirements of Jackson v. Denno, 378 U. S. 368, 84 S. Ct. 1774, 12 L. ed. (2d) 908. In that case it was held that where the voluntariness of a confession is disputed, the trial judge must determine from evidence heard by him in the absence of the jury that the confessions were as a matter of fact voluntarily given. The previous practice in this state, approved in State v. Schabert, 218 Minn. 1, 15 N. W. (2d) 585, of receiving tendered confessions in evidence whenever the lack of voluntariness does not appear as a matter of law is no longer acceptable. Although language used by the trial court in considering the contested voluntariness of state's exhibits A and B suggests the possibility that he was considering the issue in accord with the practice which prevailed in this state prior to Jackson v. Denno, *supra*, we cannot say with certainty that this was the case. The fact that Jackson was, according to the record, called specifically to the attention of the trial judge suggests to us that whatever the form of explanation used, the trial court determined the vol-

---

[7] State v. Garden, 267 Minn. 97, 125 N. W. (2d) 591.

untariness of the confession according to the requirements of that decision. The record shows that at the hearing in chambers the trial court received testimony regarding the circumstances surrounding the confession, including whether defendant was advised of his constitutional rights and informed that the confession could be used against him at trial, prior to determining the confession to be voluntary and submitting it to the jury.

Even though we were to hold the trial court had not complied with the practice required by Jackson, defendant would not automatically be entitled to a new trial. The relief afforded in such a situation would be a remand of the case to the district court for a hearing confined exclusively to the admissibility of state's exhibits A and B. Only if one or both of these confessions was found involuntary as a matter of fact upon such hearing, would a new trial be required.

These considerations in combination have led us to the conclusion that the belated claims of defendant concerning the trial court's hearing and determination with respect to exhibits A and B should be rejected.

### SEARCH AND SEIZURE

■ State's exhibit A, the written statement prepared and executed by defendant before his apprehension, was not the product of an illegal search and seizure. As defendant announced while he was writing this confession, he intended it to be his explanation of the tragic event. When the investigating officials arrived at the scene, he invited them to read it and placed it in his automobile where it would be available to them. Acceptance of a statement tendered voluntarily by a suspect is not a search and seizure.

### MINN. ST. 611.033

■ Minn. St. 611.033 provides:

"No statement, confession, or admission in writing shall be received in evidence in any criminal proceeding against any defendant unless *at the time of the taking thereof* such defendant

shall have been furnished with a copy thereof and which statement, confession, or admission shall have endorsed thereon or attached thereto the receipt of the accused which shall state that a copy thereof has been received by him." (Italics supplied.)

There is no "taking" of a statement, confession or admission from a defendant within the meaning of § 611.033 when a writing prepared by the defendant himself upon his own initiative when not in custody or in any way subject to the direction or control or influence of investigating officers, and without request, suggestion, or solicitation on their part, is made available to law-enforcement officials by the defendant.

## DISCLOSURE

■ We are seriously concerned by the claim made in defendant's pro se brief that the state failed to produce evidence in its possession favorable to defendant on the issue of self-defense.[8] It is clear to us that if the state had such evidence in its possession at the time of trial, it was obligated to produce it, particularly where, as in this case, a demand was made by defendant's counsel that such evidence—specifically, copies of any writings attributed to defendant—be produced. But on the record now before us this claim of defendant is a bare assertion. There was no showing, and no attempt to show, that the state withheld evidence favorable to defendant. Unless and until the facts upon which this claim is based are established, the charge is without factual foundation and cannot be entertained in this court.

## INCONSISTENT TESTIMONY

■ Defendant's pro se claim that witnesses for the state gave false testimony is based upon demonstrable inconsistencies in the testimony of some of the witnesses and a conflict in some particulars between one witness produced by the state and another.

---

[8] See, Brady v. Maryland, 373 U. S. 83, 83 S. Ct. 1194, 10 L. ed. (2d) 215; Miller v. Pate, 386 U. S. 1, 87 S. Ct. 785, 17 L. ed. (2d) 690; Giles v. Maryland, 386 U. S. 66, 87 S. Ct. 793, 17 L. ed. (2d) 737; Pyle v. Kansas, 317 U. S. 213, 63 S. Ct. 177, 87 L. ed. 214.

Inconsistencies and conflicts of this type are typical of trials where the witnesses are trying to reenact events which occurred in a stressful situation. They are a sign of the fallibility of human perception—not proof that false testimony was given at the trial. In fact, if the testimony of every witness was inherently consistent and conformed perfectly with that of every other in a case such as this, one experienced in the assessment of testimony would be startled and, perhaps, suspicious. It is our impression that the witnesses for the state endeavored to relate the events of October 6, 1964, and the days immediately preceding that day with candor.

Defendant's conviction of murder in the second degree is affirmed.

Affirmed.