**STATE of Minnesota, Respondent,**

v.

**Eugene Francis CUYPERS, Appellant.**

No. C7–90–2653.

Supreme Court of Minnesota.

March 6, 1992.

John Stuart, State Public Defender, Lawrence W. Pry, Asst. State Public Defender, St. Paul, for appellant.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, and Alan L. Mitchell, St. Louis County Atty., Mark S. Rubin, Asst. St. Louis County Atty., Duluth, for respondent.

WAHL, Justice.

Eugene Francis Cuypers appeals from a judgment of conviction of premeditated murder in the first degree [1] for the killing of Larry Sullivan on November 26, 1989. Cuypers challenges the conviction on two grounds: first, that his federal and state constitutional rights against unreasonable searches and seizures were violated by admission at trial of two letters he had written while awaiting trial in the St. Louis County jail which were seized by his jailers without probable cause and without warrant; and, second, that the trial court committed reversible error by refusing to instruct the jury on the lesser-included offense of first degree "heat of passion" manslaughter. We affirm.

Defendant Cuypers lived with his family on McQuade Road in rural St. Louis County and was engaged to marry Rebecca Colstad. The Colstad and Fosgate families also lived on McQuade Road as had Dusty Schroyer. Larry Sullivan, who had lived with both the Colstads and Schroyer, lived in a trailer house at the end of McQuade Road.

From testimony at trial, it appears that the Cuypers and Colstads believed Lonnie Fosgate, Dusty Schroyer and Larry Sullivan belonged to a paramilitary survivalist organization. Jim Colstad had reported to the sheriff that he had found uniforms with Schroyer's name on them and literature from the Phoenix Survivalist Organization advocating the overthrow of the government in a truck he had parked on Fosgate's property.

Just before deer hunting season in 1989, Fosgate and Sullivan came to the Cuypers' house. According to the testimony of Eugene Cuypers, Sr., and Shirley Cuypers, defendant's father and mother, Fosgate said, "I heard you're gunning for me ... I can sure as hell shoot you guys first if you come in the woods." Defendant was present and heard this threat.

Defendant testified that, because he believed his family and the Colstad family to be in danger and because he was afraid of Fosgate, he walked to the Fosgate house on Sunday, November 26, to retrieve two rifles which belonged to Jim Colstad. Rusty Greenman, who went with defendant, said they went to get the guns because Colstad wanted them back. Fosgate was not at home but had left Larry Sullivan to watch over his property. Defendant and Greenman told Sullivan they were having car trouble and Sullivan gave them a ride to Colstads. Fifteen minutes later the two drove back to Fosgate's house with Jeremy Colstad. Sullivan was still there. They asked Sullivan to look at the car to see what was wrong with it.

Defendant had learned a few weeks earlier that five years before Sullivan had sexually molested defendant's fiancee, Rebecca Colstad, who was twelve years old at the time. Defendant testified that when Sullivan was looking at the car, he remembered the sexual assault and hit Sullivan over the head with a birch branch, knocking him down. While Greenman and Jeremy Colstad watched over Sullivan, defen-

---

1. Minn.Stat. § 609.185(1).

dant entered Fosgate's house and took two guns.

Defendant then tried to make Sullivan recount what he had done to Rebecca. When Sullivan kept saying he didn't know, defendant and Greenman made him kneel on the floor of the front seat of defendant's car and, with defendant at the wheel, drove five miles into the woods on Fox Farm Road, yelling at him to scare him. Defendant and Greenman left Jeremy Colstad in the car and took Sullivan into the woods where defendant continued to scream at Sullivan and ask him what he did to Becky and why he was threatening defendant's family. When Sullivan said he didn't remember and turned and started to walk away, defendant shot him through the back of the head, killing him. Defendant covered Sullivan's body with weeds, returned with Greenman to the car and drove away.

Several days later Fosgate reported to the sheriff that two guns had been taken from his home and that Sullivan was missing. On December 7, 1989, police searched the Cuypers' home and car, pursuant to a warrant, and recovered the Ruger .44 and the Jennings .22 which Fosgate had reported missing. Defendant said he had found the guns in a bag but knew nothing as to Larry Sullivan's whereabouts.

Later that night police were called by Jim Colstad and, at Colstad's home, defendant confessed to having killed Sullivan. He tried to show Sgt. Ojard where the body was but was prevented by cold and darkness. Sgt. Ojard took defendant to the security psychiatric ward at St. Luke's Hospital because defendant's family was afraid he would harm himself.

The next morning, after sheriff's deputies had found Sullivan's body, Ojard arrested defendant for murder. Ojard took defendant, at defendant's request, to see Father McEnery in Carlton County and, on the way back, Cuypers gave another statement to Ojard, admitting the burglary of Fosgate's home. He also said he drove Sullivan into the woods, hoping to get a tape recorded admission of Sullivan's sexual molestation of Rebecca Colstad so that Sullivan could be brought to justice. De-fendant said he only intended to scare Sullivan into admitting what he had done but when Sullivan kept saying he didn't know and turned to walk away, defendant got madder and madder and shot him.

On January 12, 1990, Cuypers was indicted by a St. Louis County grand jury on charges of premeditated murder in the first degree (Minn.Stat. § 609.185(1)); first degree felony murder (Minn.Stat. § 609.-185(3)); kidnapping (Minn.Stat. § 609.25, subd. 1(3)); and burglary in the first degree (Minn.Stat. § 609.582, subd. 1(c)). The trial court stayed proceedings and ordered a Rule 20 evaluation. On April 9, 1990, the trial court found defendant competent to stand trial and ordered resumption of criminal proceedings. Defendant moved for dismissal of the indictment, for a change of venue, and for suppression of physical evidence including two letters seized by his jailers while he was in the St. Louis County jail awaiting trial. The trial court denied those motions. After a jury trial, defendant was found guilty of all charges and sentenced to a mandatory term of life imprisonment for first degree premeditated murder and to a concurrent term of 108 months in prison for burglary. This appeal followed.

■ 1. The primary issue defendant raises is that his federal and state constitutional rights were violated by the admission at trial of two letters he wrote while in jail awaiting trial which were seized by his jailers without probable cause or a warrant.

Cuypers handed the first letter to Deputy Sheriff's Guard Brad Keeney, on January 14, 1990, as the guard was walking past defendant's cellblock. Keeney, noticing that the letter was sealed, advised defendant that, according to jail policy, the letter could not be sealed and that Keeney would have to open and check the letter for contraband before mailing it. Only letters to attorneys and judges could be sealed. Keeney testified that this policy was in a handbook provided to inmates. Keeney told defendant he could have the letter back if he did not want it opened and checked. Cuypers told him to go ahead

and open it. The letter, addressed to a rock group, Metallica Metal Militia, mentioned the shooting of a "faget" [sic] and was signed "guilty as charged." Keeney also testified that Cuypers had been under "suicide watch" since coming to the jail because of his state of mind.

The second letter, a letter to Rebecca Colstad, was given by defendant to Deputy Sheriff's Guard Kathy Snyder on August 25, 1990, while he was still in jail awaiting trial. Defendant asked Snyder to mail the letter, which was unsealed. Snyder scanned the letter to see if it contained any type of written contraband. The words "please let this boy die like a man" caught her attention as possibly suicidal in nature. The letter was kept by the sheriff's office and a photocopy was sent to Rebecca Colstad.

The trial court, in denying defendant's motions to suppress the letters, found that the policy of the St. Louis County jail to open and screen all outgoing mail to non-inmates, except privileged communications with attorneys and judges, was for the purpose of discovering any written contraband, such as escape plans or plans to smuggle drugs or weapons into the jail. The trial court cited *Minnesota Civil Liberties Union v. Schoen*, 448 F.Supp. 960 (D.Minn.1977), for the rule that "'censorship of prisoner mail is justified if * * * [the] practice in question * * * further[s] an important or substantial governmental interest unrelated to the suppression of expression * * * [and] the limitation of First Amendment freedoms [is] no greater than is necessary or essential to the protection of [that] interest.'" *Id.* at 965 (quoting *Procunier v. Martinez*, 416 U.S. 396, 413, 94 S.Ct. 1800, 1811, 40 L.Ed.2d 224 (1974)). The trial court then found the interests of the jail in eliminating contraband in the jail and preventing escape, as well as in protecting those on "suicide watch," to be important and substantial government interests furthered by the policy of opening and screening outgoing inmate mail. Having determined the jail policy to be constitutional, the trial court found no basis for suppressing the letters as

"fruit" of illegal police conduct and properly held them to be admissible.

■ Inmates in Minnesota jails and prisons, including those in jail awaiting trial, retain those constitutional rights that are not inconsistent with their status as prisoners and that do not interfere with legitimate concerns for security and safety within the institution. *See Turner v. Safley*, 482 U.S. 78, 84, 107 S.Ct. 2254, 2259, 96 L.Ed.2d 64 (1987); *Hudson v. Palmer*, 468 U.S. 517, 530, 104 S.Ct. 3194, 3202, 82 L.Ed.2d 393 (1984). However, "there must be mutual accommodation between institutional needs and objectives and the provisions of the Constitution that are of general application." *Wolff v. McDonnell*, 418 U.S. 539, 556, 94 S.Ct. 2963, 2975, 41 L.Ed.2d 935 (1974). This principle applies equally to pretrial detainees and convicted prisoners. *Bell v. Wolfish*, 441 U.S. 520, 546, 99 S.Ct. 1861, 1877–78, 60 L.Ed.2d 447 (1979).

■ In this case, defendant challenges, on Fourth Amendment grounds, the admission into evidence of the contents of letters discovered by jail officials inspecting outgoing mail without probable cause and without a warrant. That challenge must fail. A search of the outgoing mail of a pretrial detainee based on a jail regulation which is constitutionally valid is not an unreasonable search. The jail regulation in this case is valid because it furthers a substantial governmental interest such as security of the jail itself from contraband and of the inmate from self-destruction and is not unnecessarily broad. As the Eighth Circuit Court of Appeals has held, evidence discovered by prison officials, acting pursuant to a valid prison regulation and within the limits of the Fourth Amendment, is admissible. *United States v. Kelton*, 791 F.2d 101, 103 (8th Cir.), *cert. denied*, 479 U.S. 989, 107 S.Ct. 583, 93 L.Ed.2d 586 (1986).

■ Furthermore, an unlawful search or seizure within the meaning of the Fourth Amendment occurs only when an individual's expectation of privacy is invaded. *Katz v. United States*, 389 U.S. 347, 353, 88 S.Ct. 507, 512, 19 L.Ed.2d 576 (1967).

**557**

An individual's reasonable expectation of privacy is necessarily restricted, however, when the individual asserting that expectation is incarcerated. *United States v. Savage*, 482 F.2d 1371, 1372–73 (9th Cir.1973), *cert. denied*, 415 U.S. 932, 94 S.Ct. 1446, 39 L.Ed.2d 491 (1974).

 The existence of a valid jail regulation permitting interception and inspection of inmate mail not addressed to a lawyer or judge, in conjunction with Cuypers' knowledge of that regulation, both through the inmate handbook provided him and through the information given him orally by the guards, destroys any expectation of privacy he may otherwise have had in his outgoing mail. In addition, Cuypers was offered the opportunity to take the letters back without inspection and chose not to take them back. "[H]e himself laid in front of the jailer that which he now seeks to preserve as private." *State v. Johnson*, 456 S.W.2d 1, 3 (Mo.1970). The letters were admissible. Defendant has not provided the court with any basis for finding that our state constitution requires a different result in this case.

Accordingly, we hold that defendant's federal and state constitutional rights against unreasonable searches and seizure were not violated by the admission into evidence of two letters written by defendant, while a pretrial detainee, and seized by his jailers pursuant to a constitutionally valid jail regulation.

 2. The second issue raised is whether the trial court erred in refusing to instruct the jury on first degree "heat of passion" manslaughter. Such an instruction is not required where the evidence does not reasonably support a conviction of this lesser crime. *State v. Gore*, 451 N.W.2d 313, 316 (Minn.1990). Defendant's emotional state alone will not mitigate murder to manslaughter. *State v. Buchanan*, 431 N.W.2d 542, 549 (Minn.1988). The words and acts of the victim must have been enough to provoke a person of ordinary self control. *Id.* Here, the words and acts of Sullivan were clearly not sufficient provocation for a "heat of passion" response by Cuypers. Furthermore, as this

Court has held in case after case, past acts of the victim, here five years past, cannot justify a "heat of passion" instruction. *See, e.g., State v. Merrill*, 428 N.W.2d 361, 371 (Minn.1988) (no merit to argument that rage over alleged rape that had happened earlier in the day provoked killing where killing occurred during robbery); *State v. Edwards*, 343 N.W.2d 269, 273 (Minn.1984) (rage arising from knowledge that victim had previously abused sister insufficient provocation); *State v. Hanson*, 286 Minn. 317, 176 N.W.2d 607, 614 (1970) (passions arising out of knowledge of wife's past infidelity cannot justify homicide).

The trial court properly refused to instruct the jury on first degree "heat of passion" manslaughter because the evidence does not reasonably support a conviction of this lesser crime.

The judgment of conviction is affirmed.