## STATE v. FRANK WELTZ.[1]

April 6, 1923.

: No. 23,073.

**What is unnecessary for state to show in prosecution for murder in the third degree.**

1. To establish the charge of murder in the third degree, the state need not show that defendant was inherently of depraved mind. The nature of the act causing the death of another, and the circumstances attending it, may be prima facie evidence that the doer of the act was a man of depraved mind.

**Defendant's act justified verdict.**

2. The evidence justified the jury in finding from defendant's act alone, viewed in the light of the attending circumstances, that he was a man of depraved mind within the meaning of section 8606, G. S. 1913, defining third degree murder.

Defendant was indicted by the grand jury of Ramsey county charged with the crime of murder in the third degree, tried in the district court for that county before Olin B. Lewis, J., and a jury which found him guilty as charged in the indictment. From the

[1]Reported in 193 N. W. 42.

judgment entered pursuant to the verdict, defendant appealed. Affirmed.

*Drill & Drill,* for appellant.

*Clifford L. Hilton,* Attorney General, and *James E. Markham,* Assistant Attorney General, *Richard D. O'Brien,* County Attorney, and *Raymond F. Schroeder,* Assistant County Attorney, for respondent.

LEES, C.

Defendant was indicted upon a charge of murder·in the third degree, found guilty and appealed from the judgment pronounced by the court. Two questions are presented for determination: (1) Must there be proof that one charged with third degree murder was inherently of depraved mind, or may the act and the attending circumstances be evidence enough of mental depravity? (2) Did defendant's acts and the attending circumstances evince a depraved mind?

1. At common·law, every homicide not excusable or justifiable was either murder or manslaughter. If the slayer was actuated by malice, express or implied, he was guilty of murder; in the absence of malice, the crime was manslaughter. Archbold, Crim. Pl. Evid. & Prac. [25th ed.] 853; 1 Russell, Law of Crimes, 655, 780; Wharton, Homicide, §§ 1, 2 and 3. The term "malice" was not employed to denote ill will towards the victim. It was used in a broader sense. If a homicide was attended with such circumstances as are the ordinary symptoms of a wicked or depraved spirit regardless of social duty and fatally bent on mischief, malice was inferred. The malice which distinguished murder from other species of homicide was not limited to particular ill-will against the person slain. If there was a general malice or depraved inclination to mischief, fall where it may, and the act was unlawful, attended with probable serious danger to others and done with a mischievous intent to hurt people, the homicide was murder. 1 Russell, Law of Crimes, 757. Common illustrations were the intentional driving of a carriage in among a crowd at a furious speed, resulting in the death of one in the crowd; or the discharging of a gun among a multitude of people and killing one of them. Mere negligence would not do. There

must be wicked negligence, so great as to satisfy the jury that the accused had a wicked mind in the sense that he was indifferent to the safety of others, reckless and careless whether or not he caused the death of a human being. Archbold, Crim. Pl. Evid. & Pract. [25th ed.] 837.

In this state of the law, New York, in 1829, adopted a statute defining murder and manslaughter respectively. The statute is quoted in Darry v. People, 10 N. Y. bottom of page 122. It declared that the killing of a human being should be murder when perpetrated by an act imminently dangerous to others and evincing a depraved mind, regardless of human life, although without any premeditated design to effect the death of any particular individual. Our statute defining murder in the third degree (section 8606, G. S. 1913), is virtually a reproduction of the New York statute. In Darry v. People, supra, the court said there was no doubt as to the nature of the cases contemplated by the statute. They were cases of depraved and reckless conduct, aimed at no one in particular but endangering indiscriminately the lives of many and resulting in the death of one or more. Page 146. The statute was directed at acts perpetrated with a full consciousness that they were calculated to put the lives of others in jeopardy. Such acts evince a reckless disregard of human life fully equivalent to a direct design to destroy it. Page 148. The act must evince a depraved mind, regardless of human life. These words are exactly descriptive of general malice. They define general recklessness. The act by which death is effected must evince a disregard of human life. Page 156. Wisconsin has long had a similar statute. Section 4339, Wis. St. 1921. In Hogan v. State, 36 Wis. 226, the court said of it that the qualities of the act, as imminently dangerous and evincing a depraved mind regardless of human life, are to be found in the act itself and the circumstances of its commission.

Speaking of our own statute, in State v. Lowe, 66 Minn. 296, 68 N. W. 1094, it was said it was intended to cover cases where reckless, mischievous or wanton acts were committed without special regard to their effect on a particular person, but with a reckless disregard of whether they injured one person or another; and in

State v. Nelson, 148 Minn. 285, 181 N. W. 850, that it involves an unintentional killing without a special design upon a particular person by an act eminently dangerous to others, evincing a mind depraved and regardless of human life. It seems reasonably clear that the statute was intended to formulate the doctrine of the common law that, although malice was an essential element of the crime of murder, it need not be proved directly but might be inferred from the perpetration of such an act as is described in the statute. It is a principle of universal application that a sane man is presumed to intend the natural and probable consequence of his own voluntary acts. In a moral sense the unintentional taking of human life by an act evincing a wanton and reckless disregard of life in general is less wicked than the premeditated taking of the life of a particular individual. In either case it is murder, but the statute makes a distinction as to the degree of guilt. To constitute murder in the first degree, there must be premeditation. Section 8603, G. S. 1913.

In State v. Lautenschlager, 22 Minn. 514, an instruction that the law presumes a premeditated design from the naked fact of the killing when coupled with the statement that, if explanatory circumstances are shown, they are to be considered in arriving at the intent and design, was upheld. This was referred to with approval in State v. Prolow, 98 Minn. 459, 108 N. W. 873, where the earlier decisions touching the point are reviewed. In State v. Wormack, 150 Minn. 249, 184 N. W. 970, following State v. Brown, 41 Minn. 319, 43 N. W. 69, it was held that first degree murder might be found from the mere fact and circumstances of the killing.

A parity of reasoning leads to the conclusion that the nature of an act and the circumstances attending it may be prima facie evidence that the doer of the act was in fact a man of depraved mind. What more persuasive proof of the quality of mind can there be than the acts which the mind has prompted? If the act inevitably endangers human life, as every sane man must know, is it not in and of itself convincing proof that the doer had a depraved inclination to mischief; that he had no regard for social duty; that he was generally reckless of life, possessed, in short, of a depraved mind within the meaning of the statute? It is our view that these

questions must be answered in the affirmative. This view finds support in the cases: State v. Lowe, supra; State v. Nelson, supra; State v. Stokely, 16 Minn. 249, 258 (282); Darry v. People, supra; Hogan v. State, supra; Johnson v. State, 129 Wis. 146, 108 N. W. 55, 5 L. R. A. (N. S.) 809, 9 Ann. Cas. 923; Washington v. State, 60 Ala. 10-14, 31 Am. Rep. 28; Alvarez v. State, 41 Fla. 532-539, 27 South. 40; Longinotti v. People, 46 Colo. 173, 102 Pac. 165; People v. Darragh, 141 App. Div. 408, 126 N. Y. Supp. 522.

2. Defendant is a single man, 37 years of age, a plumber by trade, and was the owner of a Cadillac car, which he drove himself. He lived at the house of Mrs. Alma Walker in the district known as the West Side of St. Paul. During part of the afternoon of Sunday, May 7, 1922, accompanied by Mrs. Walker, he was engaged in towing a disabled automobile. Later he and she drove to the northerly portion of St. Paul to pay a bill, then to the business district, and finally over the Wabasha street bridge on their way home. When near home, they stopped at the place of business of one Adams. According to their testimony, Mrs. Walker remained in the car while defendant went in to get a glass of root beer. There is a conflict in the testimony as to the length of time he was in the Adams place. Adams fixed it at ten minutes, Mrs. Walker at more than half an hour, and another witness at three-quarters of an hour. Finally Mrs. Walker sent a police officer in to ask defendant to come out. When he came, he carried two glasses filled with a liquid of some sort. Adams said it was root beer. Mrs. Walker said it looked like root beer but smelled like ether. She poured the contents of both glasses in the street. Describing defendant's appearance at this time, she said he looked pale, his face drawn, and his eyes staring and drowsy. She asked him what had happened, but he made no answer. He took the empty glasses back, then returned to the car, got in and drove off rather fast. While he was returning the glasses, she got out of the car. Another witness testified that when defendant came out he staggered and had difficulty in getting into the car; and another, that he engaged in an argument with Mrs. Walker, he trying to start the car and she trying to prevent him until about ten minutes had elapsed, when she jumped out and

defendant drove off at a high rate of speed. The witnesses agree that it was then about 7:30 o'clock.

Mr. and Mrs. Peabody, accompanied by Mrs. Peabody's sister and her husband, had driven in the Peabody car to the Palace Theater on the West Side of St. Paul and had parked the car on Winifred street near the theater. Mr. Peabody had started to cross the street diagonally to get the theater tickets, the others following him. The roar of a fast approaching automobile was heard and defendant appeared, driving at a speed estimated by some spectators as high as 50 miles an hour, and by none at less than 30 miles an hour. He struck Mrs. Peabody, rolling her body under the car and injuring her so badly that she died on the following morning. A few moments later he reappeared, driving back in the direction from which he had first come and scattering the crowd which had gathered on the street. He was pursued by police officers on motorcycles, who testified that his speed as he fled was over 50 miles an hour; that he paid no attention to their commands to halt; that they began to shoot at the tires of his car, continuing until their ammunition was exhausted; that when they tried to run alongside his car, he crowded them against the curb, steering from side to side in an attempt to run them down; that he yelled: "Shoot. Kill me;" that when one of the officers finally got on the running board of the car, defendant grappled with him, saying, "I got you that time"; that the car then ran over the side of the street, struck a large rock and stopped, and not until after he had been vigorously clubbed did defendant submit to arrest. The officers agreed that he was intoxicated. One was of the opinion that he was not so drunk he did not know what he was doing; another described him as crazy drunk; and the third, as looking crazy.

Intoxication may temporarily arouse passions and paralyze or pervert the will without depriving its victim of the power to distinguish between right and wrong and to comprehend the nature of his acts. It would seem that defendant was in that condition mentally when he ran over Mrs. Peabody. He was observed by a number of witnesses. All agreed that he appeared to be highly excited, beside himself with anger, in a violent mood, with a wild look on his face,

which was pale, his eyes staring, and his body crouched over the steering wheel as he drove his car at its utmost speed.

Testifying in his own behalf, defendant said he ordered and drank one glass of root beer when he entered the Adams place, whereupon everything clouded up and he knew nothing more until he found himself in a cell in jail. He admitted that he drank intoxicating liquor at times and had been intoxicated before, but denied drinking anything but the glass of root beer on the occasion in question.

The foregoing is a condensed statement of the relevant and material portions of all the testimony. The jury might well conclude that the defendant was very drunk and had voluntarily gotten into that condition, knowing that to reach home he would have to drive his car along much traveled streets at a time when many people were abroad. His act was none the less criminal because he was drunk, unless he was for the time being insane and incapable of knowing the nature of his act or that it was wrong. Sections 8474, 8475, G. S. 1913. Insanity was not asserted as a defense. It could hardly have been asserted successfully. It is a fair inference from the evidence that defendant quarreled with Mrs. Walker, and that liquor and the quarrel combined to excite him to the point of frenzied anger. A mind which may become inflamed by liquor and passion to such a degree that it ceases to care for human life and safety is a depraved mind. Defendant may have been beside himself with rage, but he knew enough to start and guide his car, to fly when pursued, and to seek to escape by running down the officers who tried to intercept him. The jury were justified in finding that he was guilty of something more serious than culpable negligence and that his acts evinced a depraved mind in the sense in which that term is used in the statute defining third degree murder. The rulings of the learned trial judge made in the course of the trial and the instructions to the jury were free from error. In a case well calculated to arouse animosity towards defendant, he received at the hands of the court a trial which was a model of fairness, resulting in a verdict of which he has no just cause to complain.

Judgment affirmed.