38736. RIVERS v. THE STATE.

MARSHALL, Presiding Justice.

Hattie Watts, her son Rickey, and her granddaughter Alicia were murdered in McDuffie County on the evening of July 4, 1981. The defendant, Hill Rivers, was arrested on July 10 and charged with three counts of murder, one count of kidnapping with bodily injury and one count of aggravated sodomy. He was tried in November of 1981, convicted on all five counts, and sentenced to death for each of the three murders. At trial, the state presented the following evidence.

Hattie Watts resided in McDuffie County, approximately two miles south of the Columbia County line, at the intersection of State Highway 221 and a dirt road identified as Watts Road. Approximately one-half mile west of this intersection, Watts Road intersected Gay Road. Between Hattie's house and Highway 221 was a seldom used logging road which ran south from the Watts residence and roughly parallel to Highway 221.

Hattie's son, Bobby, lived just west of her on Watts Road. Bobby and Olin Johnson left Bobby's house at 6:00 p.m. They saw a white Ford stopped at the intersection of Watts Road and Highway 221, with a black man inside. As they approached, the car turned south on Highway 221.

Lillian Brewer, her husband Wallace, and their grandson Derek Holcomb spent the afternoon of the fourth with Hattie. As they were traveling home on Watts Road shortly before 7:00 p.m., they were forced to stop at the intersection of Watts Road and Gay Road because a "big white car was stopped right across the road." A black

man with a shuffling gait walked to their car. Mr. Brewer asked the man to let them pass. After some hesitation and further conversation, the man started the car and left. Mr. and Mrs. Brewer and Derek later identified the occupant of the white car as the defendant, Hill Rivers.

At 7:00 p.m., Henry Miller saw a white Ford stopped on Gay Road. Miller stopped to see if the driver was lost and the car took off.

Bobby Watts, who had returned from his previous outing, left his house again shortly after 7:00 p.m. He saw a white Ford parked south of his mother's house on the logging road. A black man was walking nearby.

Alicia's mother called Hattie at 8:00 p.m. Alicia answered and told her mother that Hattie and Rickey were in the yard, talking to a black man. Alicia said she would call back. She never did. Her mother called again at 9:00 p.m. There was no answer. She called Bobby's wife, Kathy, and Kathy went to Hattie's house.

Hattie was sitting in a living room chair with two gunshot wounds in her head. Rickey was lying on the couch, nude except for his socks. He had been shot in the head and back. The living room had been ransacked and approximately $40 was missing, as well as Hattie's red clutch purse with her driver's license and other identification. Alicia was not in the house.

Rickey was later examined by Warren Tillman of the state crime lab. From contusions and distentions of the rectum, he concluded that Rickey had obviously been sodomized. Fluid, which could not be positively identified as seminal, but which was foreign to Rickey's body, was discovered in his rectum.

Frank and Kathy Overton lived approximately two and one-half miles north of Hattie on Highway 221, in Columbia County. They left their house around 4:00 p.m. on July 4. After they left, their neighbor observed a white car parked near the Overton residence for 15 or 20 minutes.

The Overtons returned home at approximately 1:30 or 2:00 a.m. on the fifth. Their house had been broken into and a cash box used as a jewelry box had been taken.

Law enforcement officers called to Hattie's house on the evening of the fourth were unable to find Alicia that night. The search continued the next morning. One pair of footprints was discovered leading to Hattie's house. Two pairs of footprints, one large and one small, were discovered in a garden behind Hattie's house and were picked up again in a cornfield further south. These footprints led away from the house. Further south, near the logging road, they discovered the same two sets of footprints and also tire tracks indicating that a car with one mud-grip tire on its left rear had turned around by driving up an embankment and coasting backwards. Not

far from these last tracks, investigators discovered a cash box which was later identified as the one taken from the Overtons in Columbia County. The cash box was dusted for fingerprints. One print was later identified as belonging to the defendant, Hill Rivers.

Farther down the logging road more tire tracks, made by a car with one mud-grip tire on its left rear, were discovered. The road led to an area in which the woods had been thinned out. The same tire tracks circled around a tree. Footprints, one set large and the other set small, led from the tire tracks to a brush pile, where Alicia's body was found. She had been shot once in the head. Logan Marshall, who discovered Alicia's body, noticed a slight discoloration circling the left wrist. The larger footprints had always been to the left of the smaller ones, and the small footprints indicated that the person who made them had been dragged.

More tire tracks made by a car with one mud-grip tire on its left rear were discovered circling a silo next to Gay Road, not far from where Henry Miller had seen a white Ford. Another mud-grip track was discovered in the Overton's dirt driveway. All of these tire tracks were made by a car which never traveled in reverse. It was subsequently established that on July 4, 1981, the defendant owned a white 1969 Ford with one mud-grip tire on its left rear and no reverse gear.

Footprints similar in size to the larger footprints discovered in McDuffie County, exhibiting a similar defect in the heel and a similar characteristic protrusion around the toe, were discovered at the scene of a double murder in Burke County which had occurred July 3. Ballistics tests showed that the bullets removed from the body of Hattie Watts and from her living room had been fired from the same gun used to kill Alan Reeves and Alan Shirley in Burke County.[1]

Four rings taken from the Overtons in Columbia County were discovered in the defendant's pocket when he was arrested July 10. Other items stolen from the Overtons and from the Reeves' home were found in the defendant's car and trailer.

1. In his first five enumerations of error, the defendant contends that the evidence is insufficient to support his convictions. We disagree. The evidence, viewed in the light most favorable to the state, was sufficient to enable the jury to find the defendant guilty on all five counts beyond a reasonable doubt. Jackson v. Virginia, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

2. In his sixth enumeration of error, the defendant contends

---

[1] For a complete statement of the facts of the Burke County murders, see *Rivers v. State,* 250 Ga. 288 (—— SE2d ——) (1982).

that the trial court erred in admitting evidence relating to crimes in Burke and Columbia counties over his objection. We find no error. *Rivers v. State,* 250 Ga. 288 (5) (—— SE2d ——) (1982).

3. In his ninth enumeration of error, the defendant contends that the trial court erred in denying his motion for change of venue based upon pretrial publicity.

The defendant first contends that the percentage of jurors excused because of prejudice, 16 2/3 percent, indicates prejudicial bias to a degree rendering a fair trial impossible. We disagree. On the contrary, the low percentage of veniremen excused for cause corroborates the absence of such prejudicial publicity as would require the grant of a motion for change of venue. *Messer v. State,* 247 Ga. 316 (4) (276 SE2d 15) (1981). Nor has the defendant otherwise demonstrated that the setting of the trial was inherently prejudicial. See *Kesler v. State,* 249 Ga. 462 (7) (291 SE2d 497) (1982).

4. In his tenth enumeration of error, the defendant contends that the trial court erred in allowing three witnesses, Derek Holcomb, Lillian Brewer and Wallace Brewer, to identify him at trial because their identifications were tainted by an impermissibly suggestive pretrial photographic display.

On July 7, 1981, these witnesses were shown a photographic lineup containing six pictures of black men of approximately the same age. Picture five and picture six were both of the defendant. The fifth picture was a mug shot of the defendant with short hair and no glasses. The sixth picture was a profile showing the defendant with long hair and wearing glasses, leaning against an automobile. The remaining four pictures were mug shots.

After the defendant was arrested, these three witnesses were again shown a photographic display; this one contained seven pictures, only one of which was the defendant.

The state conceded during the trial that the first photographic display should not have contained two photographs of the defendant, but contended then, as now, that the in-court identifications were reliable even though the confrontation procedure was suggestive.[2] See Neil v. Biggers, 409 U. S. 188 (93 SC 375, 34 LE2d 401) (1972); Manson v. Brathwaite, 432 U. S. 98 (97 SC 2243, 53 LE2d 140) (1977).

The testimony given by Mr. and Mrs. Brewer and Derek Holcomb was summarized in the statement of facts. Mr. and Mrs. Brewer accurately described the defendant to investigators the day

---

[2] The Attorney General argues that no error occurred as to Wallace Brewer because Mr. Brewer did not testify in the jury's presence. This assertion is belied by the transcript. Transcript, Vol. IV, pp. 5-14.

after the murder, before they saw either photographic display, and helped construct a composite drawing of the defendant. All three witnesses accurately and without hesitation selected photographs of the defendant from both photographic displays. They testified that they were able to get a good look at the defendant as he approached their car and were positive that the defendant was the man in the white car.

Based upon the foregoing, we conclude that their testimony was not impermissibly tainted by an unnecessarily suggestive photographic display and the trial court did not err in allowing their testimony. *Burrell v. State,* 239 Ga. 792 (239 SE2d 11) (1977).

5. The defendant filed a motion for continuance on November 13, 1981, which was heard on November 16. The motion was denied and the defendant was tried November 17 through November 21, 1981. In his eleventh enumeration of error, the defendant contends that the denial of his motion for continuance was error.

At the hearing on the motion, the defendant's attorneys contended that a continuance was necessary because (1) the defendant had, until recently, refused to cooperate with them and (2) the state did not furnish a complete list of witnesses until November 11, and the list contained 63 names.

We note that the state provided a list of not only names, but also addresses of its witnesses; in addition, the state allowed the defense to examine its entire file, which, according to the unrefuted assertion of the district attorney, included either written statements, or synopses of written statements, of every witness the state planned to call at trial.

Two attorneys were appointed to represent the defendant on July 14, 1981, four days after his arrest. Because of a conflict, one was allowed to withdraw and another was appointed July 21. A committal hearing was held on July 21.

At the time of the trial, the defendant's two attorneys had been representing him for almost four months. They had the benefit of committal-hearing testimony, and they had access to the state's file and to statements of the state's witnesses. That they did not have the benefit of the defendant's cooperation until shortly before trial, is the defendant's own fault, about which he cannot now complain.

"A refusal to grant a continuance will not be disturbed by appellate courts unless it clearly appears that the judge abused his discretion in this regard." *Marshall v. State,* 239 Ga. 101 (1) (236 SE2d 58) (1977). No abuse of discretion appears in this case, and there is no merit to the defendant's eleventh enumeration of error.

6. In his twelfth enumeration of error, the defendant contends that the court erred in not appointing attorneys other than Bob

Knox, Jr., and William Wheeler. Before and during the trial, the defendant had objected to being represented by local attorneys, particularly Knox, who was the mayor of Thomson, in McDuffie County, contending that no McDuffie County attorneys would go "out of their way" to defend him and that he would be "railroaded" unless he was represented by out-of-town lawyers.

The defendant's attorneys, in the brief filed by them on the defendant's behalf, concede that they are "placed in the awkward position of having to argue how they were ineffective, when they do not believe that they have been ineffective . . ." They note, however, that, because of the defendant's lack of faith in them, the defendant was initially uncommunicative and later asked for and was granted the right to question jurors during voir dire and to question a witness during the trial, and urge that, because the defendant believed from the outset of his representation by his court-appointed attorneys that they could not render effective assistance of counsel, the trial court erred in not granting the defendant's repeated requests for a change in his court-appointed counsel.

While a defendant is entitled to reasonably effective assistance of counsel, he is not entitled to counsel of his own choosing. *Kesler v. State,* 249 Ga. 462 (12), supra. There is no indication in the record before us that the defendant's attorneys, because of their connections with the community in which he was tried, were unable or unwilling to effectively represent the defendant. Nor may a defendant refuse to cooperate with his attorneys and then claim that, because of that lack of cooperation, he was not effectively represented. Cf. *Rivers v. State* (companion case), 250 Ga. 288 (2), supra.

We have reviewed the record in this case and conclude that the defendant received effective assistance of counsel at every stage of the proceedings. *Pitts v. Glass,* 231 Ga. 638 (203 SE2d 515) (1974).

### Review Under the Unified Appeal Procedure

7. Under the Georgia Unified Appeal Procedure, this court reviews the entire record of the case to "review each assertion of error *timely raised* by the defendant during the proceedings in the trial court regardless of whether or not an assertion of error was presented to the trial court by motion for new trial, and regardless of whether error is enumerated in the Supreme Court." Code Ann., Appendix to Ch. 27-25, Rule IV (b) (2). (Emphasis supplied.) With the requirements of the Unified Appeal Procedure in mind, we address a matter not addressed in the defendant's enumerations of error.

The trial court charged the jury that "the law presumes that a person intends to accomplish the natural and probable consequences of his act or acts. If a person uses a deadly weapon or instrumentality

in the manner in which said weapon or instrumentality is ordinarily employed to produce death and thereby causes the death of a human being, the law presumes the intent to kill."

At the conclusion of the charge, the jury was sent to the jury room and the court asked if there was any issue as to the argument of counsel or the charge of the court. The defendant's attorney responded, "Your Honor, the only objection we have is the omission of the lesser and included offenses as we earlier stated." The court noted the objection and asked if there were any other objections to the charge or argument of counsel. The defendant's attorney responded, "No, sir."

The general rule in this state is that defendants in criminal cases are not required to except to the jury charge to preserve error for appeal. Code Ann. § 70-207 (a). If, however, the trial court asks if there are objections to the charge, defense counsel must either state his objections or reserve the right to object on motion for new trial or on appeal. *Jackson v. State,* 246 Ga. 459 (271 SE2d 855) (1980), and cases cited therein. Where objections are requested, the failure to either object or to reserve the right to later object amounts to a procedural default barring appellate review of the charge. Ibid.

"It is not the intention of [the Georgia Unified Appeal Procedure] to permit any issue to be raised or presented in the Superior Court or the Supreme Court that previously has been waived or abandoned pursuant to the laws of this state or of the United States."[3] Thus, even under the Unified Appeal Procedure, the procedural default in this case precludes further review of the court's charge occurring in the guilt-innocence phase of the trial.[4]

Nevertheless, we note that Sandstrom v. Montana, 442 U. S. 510 (99 SC 2450, 61 LE2d 39) (1979), was decided over three years ago,

---

[3] Code Ann., Appendix to Ch. 27-25, Rule IV, A (3). We note that the broad waiver standard contained in our previous habeas corpus statute, see *McDuffie v. Jones,* 248 Ga. 544, fn. 1 (283 SE2d 601) (1981), has now been narrowed, Ga. L. 1982, pp. 786-789 (as to habeas petitions filed after January 1, 1983), bringing the scope of our state habeas review in line with that available in federal courts. See Wainwright v. Sykes, 433 U. S. 72 (97 SC 2497, 53 LE2d 594) (1977), and Engle v. Isaac, —— U. S. —— (102 SC 1558, 71 LE2d 783) (1982). There is no need in this case, therefore, to determine the correctness of the charge, in the interest of judicial economy, on the ground that a later habeas corpus challenge would be available on the same issue. Compare *Barnes v. State,* 244 Ga. 302 (260 SE2d 40) (1979).

[4] The giving of a charge similar to the one given in the instant case was found to be reversible error in *Johnson v. State,* 249 Ga. 621 (292 SE2d 696) (1982). In the instant case, however, even had the charge been properly objected to, the error in the charge would have been harmless beyond a reasonable doubt for the reasons enunciated in *Wilson v. Zant,* 249 Ga. 373 (3) (290 SE2d 442) (1982).

and we have since repeatedly "disapprove[d] and will continue to disapprove the practice of casting criminal jury instructions in terms of 'presumptions.' "[5] *Rose v. State,* 249 Ga. 628, 631 (292 SE2d 678) (1982), and cit. We advise the trial judge in this case to discontinue giving such charges.

### Sentence Review

8. Under our death-penalty statute, a death penalty may not be imposed unless at least one statutory aggravating circumstance is found. Code Ann. § 27-2534.1 (c). The defendant was sentenced to death for each of the three murders of which he was convicted. The jury found the following statutory aggravating circumstances:

The murder of Hattie Watts "was committed while the offender was engaged in the commission of burglary."

The murder of Alicia Watts "was committed while the offender was engaged in the commission of another capital felony, kidnapping with bodily injury, armed robbery and murder," and was outrageously or wantonly vile, horrible, or inhuman in that it involved toture, and depravity of mind."

The murder of Rickey Watts "was committed while the offender was engaged in the commission of burglary" and "was outrageously or wantonly vile, horrible or inhuman in that it involved torture, and depravity of mind."

(a) The trial court never defined burglary to the jury. "Burglary," as it is defined in Code Ann. § 26-1601, is a legal word of art, and whether or not all of its elements have been proven beyond a reasonable doubt cannot be rationally determined by an uninstructed jury. The two aggravating circumstances in which burglary was found must be set aside. See *Burger v. State,* 245 Ga. 458 (4) (265 SE2d 796) (1980).

(b) The trial court did not define kidnapping with bodily injury, armed robbery or murder to the jury in its sentencing-phase charge. We note that kidnapping with bodily injury and murder were defined during the guilt-innocence charge and the defendant was found guilty of both offenses. It was not error to fail to recharge those two offenses during the sentencing phase. *Cofield v. State,* 247 Ga. 98 (9) (274 SE2d 530) (1981). Armed robbery, however, was never defined. The jury's finding that the murder of Alicia Watts was committed during an armed robbery, must be set aside. *Burger v. State,* supra.

(c) The evidence supports the jury's finding that Alicia was

---

[5] Except for charges on the presumption of sanity. See *Brown v. State,* 250 Ga. 66 (295 SE2d 727) (1982).

murdered during the commission of kidnapping with bodily injury and murder.

(d) The evidence supports the jury's finding that the murder of Rickey was outrageously or wantonly vile, horrible or inhuman in that it involved torture and depravity of mind.

Serious sexual abuse may amount to serious physical abuse and hence, torture. *Hance v. State,* 245 Ga. 856 (3) (268 SE2d 339) (1980). Evidence of psychological abuse before death may amount to torture and will also support a finding of depravity of mind. Ibid. Moreover, the age and physical characteristics of the victim may be considered in determining whether the evidence shows depravity of mind.

Rickey was a 13-year-old boy who was anally sodomized, while he was still alive, in the presence of his mother, who was either (a) still alive or (b) sitting in her chair, dead. In either event, Rickey suffered serious sexual and psychological abuse before his death.

(e) The evidence supports the jury's finding that the murder of Alicia was outrageously or wantonly vile, horrible or inhuman in that it involved torture and depravity of mind.

Alicia was only seven years old when, either before or, more likely, after her grandmother and uncle were killed, she was taken against her will to a woodpile over a mile from her house and killed, execution style, with a gunshot wound to her head. Although her death from the gunshot wound was almost instantaneous, her end did not arrive with little or no forewarning. See *Hance v. State,* supra. The evidence as a whole supports a finding of serious psychological abuse before death.

9. Because it is no longer supported by a statutory aggravating circumstance, the death sentence for the murder of Hattie Watts must be reversed. The trial court shall either resentence the defendant to life or conduct a retrial as to sentencing on Count 1 of the indictment.

The following statutory aggravating circumstances remain: The murder of Alicia was committed during the commission of kidnapping with bodily injury and murder. The murders of Alicia and Rickey were outrageously or wantonly vile, horrible or inhuman in that they involved torture and depravity of mind. The jury's finding of the statutory aggravating circumstances which we have set aside does not affect the proceedings so as to invalidate the death sentences for the murders of Alicia and Rickey Watts. *Zant v. Stephens,* 250 Ga. 97 (297 SE2d 1) (1982); *Waters v. State,* 248 Ga. 355 (16) (283 SE2d 238) (1981); *Stevens v. State,* 247 Ga. 698, 709 (278 SE2d 398) (1981); *Burger v. State,* 245 Ga., supra at 462, cert. den., 446 U. S. 988 (1980); *Gates v. State,* 244 Ga. 587, 599 (261 SE2d 349) (1979), cert. den., 445 U. S. 938 (1980).

We conclude that the death penalties for the murders of Alicia and Rickey Watts were not imposed under the influence of passion, prejudice, or other arbitrary factor.

10. Code Ann. § 27-2537 (c) (3) requires us to determine whether the sentences of death are excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.[6]

The similar cases listed in the appendix support the death penalty in this case. Our cases show that juries generally find that the death penalty is appropriate punishment where an adult is found to have been the actual perpetrator of, or active participant in, multiple murders committed upon victims who are unrelated to the defendant. Our cases show, in addition, that juries generally find that the death penalty is appropriate where a young victim is sexually assaulted and murdered.

The jury in this case convicted the defendant of murdering three people, unknown to him. Two of his victims were young children, one of whom was sodomized. Moreover, the jury had before it evidence that the murders of Alicia and Rickey Watts occurred during what can accurately be described as a crime spree involving three counties, during which five innocent people were ruthlessly murdered, execution style, by gunshot wounds to the head.

The sentences of death for the murders of Alicia and Rickey Watts are neither excessive nor disproportionate to the penalty imposed, considering both the crime and the defendant.

*Judgment affirmed in part; reversed in part. All the Justices concur, except Bell, J., not participating.*

DECIDED NOVEMBER 10, 1982.

*William M. Wheeler, Robert E. Knox, Jr.,* for appellant.

*Kenneth E. Goolsby, District Attorney, Dennis C. Sanders, Assistant District Attorney, Michael J. Bowers, Attorney General, Virginia H. Jeffries, Staff Assistant Attorney General,* for appellee.

APPENDIX.

*Pass v. State,* 227 Ga. 730 (182 SE2d 779) (1971); *House v. State,* 232 Ga. 140 (205 SE2d 217) (1974); *Gregg v. State,* 233 Ga. 117 (210

---

[6] No provision is made for review of any sentence other than death. The twenty-year sentences for kidnapping with bodily injury and aggravated sodomy are not reviewable by this court.

SE2d 659) (1974); *Floyd v. State,* 233 Ga. 280 (210 SE2d 810) (1974); *Chenault v. State,* 234 Ga. 216 (215 SE2d 223) (1975); *Birt v. State,* 236 Ga. 815 (225 SE2d 248) (1976); *Coleman v. State,* 237 Ga. 84 (226 SE2d 911) (1976); *Young v. State,* 239 Ga. 53 (236 SE2d 1) (1977); *Peek v. State,* 239 Ga. 422 (238 SE2d 12) (1977); *Westbrook v. State,* 242 Ga. 151 (249 SE2d 524) (1978); *Finney v. State,* 242 Ga. 582 (250 SE2d 388) (1978); *Holton v. State,* 243 Ga. 312 (253 SE2d 736) (1979); *Patrick v. State,* 245 Ga. 417 (265 SE2d 553) (1980); *Thomas v. State,* 245 Ga. 688 (266 SE2d 499) (1980); *Cape v. State,* 246 Ga. 520 (272 SE2d 487) (1980); *Messer v. State,* 247 Ga. 316 (276 SE2d 15) (1981); *Waters v. State,* 248 Ga. 355 (283 SE2d 238) (1981); *Mathis v. State,* 249 Ga. 454 (291 SE2d 489) (1982); *Rivers v. State,* 250 Ga. 288 (—— SE2d ——) (1982).