40134. WEST v. THE STATE.

GREGORY, Justice.
Appellant, Samuel Tony West, was convicted in Chattooga County of two counts of murder and one count of armed robbery. He was sentenced to death for each of the murders and to life imprisonment for the armed robbery.

The evidence presented at trial showed that on the evening of December 12, 1982, appellant and Avery Brock visited the victims at their hand-built "castle," known as "Corpeswood," on Taylor's Ridge in Chattooga County. They were welcomed by one of the victims, Dr. Charles Scudder, a pharmacologist and former professor at Loyola University in Chicago, who offered them some of his homemade wine, which they accepted. They had brought with them a bag of "tootalu" or toluene, and they spent the next hour or two drinking Dr. Scudder's wine and "huffing" their tootalu. Then Dr. Scudder was bound and gagged while Brock searched out and shot Dr. Scudder's live-in companion, Joseph Odum. After unsuccessful attempts were made to get Dr. Scudder to tell them where his money was, appellant shot Dr. Scudder and he and Brock ransacked the house. They loaded Dr. Scudder's jeep with articles taken from the house and drove it to

Mississippi, where they stole another car after killing its driver. They later surrendered, when their money ran out.

In statements made to authorities after his arrest, appellant claimed the murders were part of a planned act of revenge for the embarrassment suffered by Brock when he had allowed Dr. Scudder to perform oral sex on him during an earlier visit. At trial, however, appellant contended the crimes were the product of hallucinations resulting from Dr. Scudder having spiked their wine with LSD.

1. We have reviewed the evidence pursuant to Rule IV (B) (2) of the Unified Appeal Procedure (Code Ann. Title 24 Appendix A) and find it sufficient to support the convictions. However, because appellant's challenge to the array of the grand jury is meritorious, his convictions and sentences must be set aside and this case remanded for reindictment and retrial.

Appellant alleges a violation of OCGA § 15-12-40 (a) (1) (Code Ann. § 59-106), which specifies the responsibilities of the board of jury commissioners in compiling, maintaining and revising jury lists, as follows: "In composing such list the commissioners shall select a fairly representative cross section of the intelligent and upright citizens of the county. . . ." It provides also: "If at any time it appears to the jury commissioners that the jury list, so composed, is not a fairly representative cross section of the intelligent and upright citizens of the county, they shall supplement the list by going out into the county and personally acquainting themselves with other citizens of the county, including intelligent and upright citizens of any significantly identifiable group in the county which may not be fairly represented on the jury list."

In *Devier v. State,* 250 Ga. 652 (300 SE2d 490) (1983), we recognized that the statute applies to the grand jury list and requires that the list be a fairly representative cross section of the intelligent and upright citizens of the county.

In this case, it was stipulated by the parties that 52% of the total population of Chattooga County is female but that women comprise only 34.3% of the grand jury list from which appellant's grand jury was selected.[1] These figures demonstrate that women are under-

---

[1] The attorney general contends that persons between the ages of 18 and 65 comprise the relevant, age-qualified population, and claims significance for the stipulated fact that women between the ages of 18 and 65 comprise 30.3% of the total population of Chattooga County. We cannot agree. Overlooking the fact that persons over 65 are not disqualified from jury duty, see OCGA § 15-12-1 (e) (Code Ann. § 59-112), in any event, the age-qualified population of women must be compared with the total age-qualified population, not with the total population, to meaningfully determine underrepresentation. The 1980 census figures admitted in evidence

represented on this grand jury list. Measured as an absolute disparity, the underrepresentation is 17.7%.

The disparity shown in this case is less than the 36% shown in *Devier v. State,* supra, which we found to be violative of OCGA § 15-12-40 (a) (1) (Code Ann. § 59-106). However, it is greater than the 14.4% absolute disparity shown by the defendant in *Barrow v. State,* 239 Ga. 162 (2a) (236 SE2d 257) (1977), which we found sufficient to establish a prima facie case of illegal underrepresentation. Moreover, the 17.7% disparity of this case falls "within the approximate boundaries delineated in [numerous federal] cases holding that the statistical disparties established prima facie violations. [Cits.]" Machetti v. Linahan, 679 F2d 236 (11th Cir. 1982).

Thus, while precise mathematical standards for gauging disparity have not been formulated, we conclude that the variance in this case is sufficient to demonstrate a violation of the statutory fair-cross-section requirement.

The state contends that we should find any deficiency in the composition of the grand jury list to be harmless in this case. We note that the grand jury which indicted appellant was 69.6% male and 30.4% female and that appellant's grand jury was thus slightly less representative than the list from which it was drawn.

The United States Supreme Court has held that a violation of equal protection in the selection of a grand jury is not cured by a subsequent conviction by a properly constituted traverse jury. Rose v. Mitchell, 443 U. S. 545 (99 SC 2993, 61 LE2d 739) (1979). This court, in *Devier v. State,* supra, as well as in *Wright v. State,* 251 Ga. 457 (306 SE2d 920) (1983), has clearly established the same rule regarding a violation of our statutory fair-cross-section requirement in the selection of a grand jury. Thus, we cannot find the error in this case to be harmless.

2. Although this case must be re-indicted and retried, we find it necessary to rule on one additional enumeration of error, in which appellant contends that the trial court's sentencing charge defining depravity of mind was error.

Citing Black's Law Dictionary (3rd Ed. 1933), the court charged:

". . . [T]he word depraved means to defame, vilify, exhibit contempt for.

"I am quoting now from this case cited in the law dictionary, a mind which may become inflamed by alcohol, drugs, or passion to

---

demonstrate that 52.1% of the total population of Chattooga County between the ages of 18 and 65 are female. Thus, the percentage of women in the age-qualified population is virtually the same as the percentage of women in the total population.

such a degree that it ceases to care for human life and safety is a depraved mind."

We have noted that the phrase "depravity of mind" contained in OCGA § 17-10-30 (b) (7) (Code Ann. § 27-2534.1) is a term having a common meaning and subject to common understanding, unlike "aggravated battery," which has been given a special meaning by statute. See, e.g. *Gilreath v. State,* 247 Ga. 814 (16) (279 SE2d 650) (1981). Thus, absent a request, depravity of mind need not be defined in the court's charge. Compare *Rivers v. State,* 250 Ga. 303 (8a) (298 SE2d 1) (1982). If, however, the court undertakes to do so, it should do so correctly.

Turning now to the first definition given by the court, we note that the verb "deprave" once meant: "To speak ill of; depreciate; malign; revile." Webster's New International Dictionary (2nd Ed. 1940). This usage is now obsolete. Ibid. In England, it was once (and perhaps still is) a criminal offense to deprave, despise or contemn "the sacrament of the supper and table of the Lord," or to say anything "in derogation, depraving, or despising of the Book of Common Prayer..." Stephens, A Digest of the Criminal Law (Soule, Thomas & Wentworth, 1877) at 110-111.[2]

This obsolete usage and these criminal offenses are the sources of the definition of "deprave" in Black's Law Dictionary, supra, which, in turn, was the source of the trial court's definition of "depraved." We conclude that this definition was incorrect in the context of a charge on the § (b) (7) aggravating circumstance.

The case cited in Black's Law Dictionary as authority for the second definition given by the trial court is State v. Weltz, 155 Minn. 143 (193 NW 42) (1923). In Weltz, the Minnesota Supreme Court was asked to determine whether the evidence was sufficient to support a conviction of third degree murder, which was defined as the "killing of a human being . . . when perpetrated by an act imminently dangerous to others and evincing a depraved mind, regardless of human life, although without any premeditated design to effect the death of any particular individual." 193 NW at 42-43. The facts of the case were that the defendant got into an argument with his non-drinking female companion over the quantity of alcohol that he had consumed at various speakeasies; that in response, the defendant angrily got into his Cadillac and drove in a rage down Winfred Street in St. Paul at a high rate of speed variously estimated at between 30 and 50 miles per hour; and that as he was doing so, he struck one Mrs.

---

[2] Stephens noted over 100 years ago that these offenses were "practically obsolete." Stephens, supra at 110, n. 2.

Peabody while she was crossing the street, killing her.

The Minnesota Supreme Court noted that, under Minnesota law, unless the defendant had been so drunk as to be incapable of knowing the nature of his act or that it was wrong, his act was nonetheless criminal. Id. at 44. The court concluded, "A mind which may become inflamed by liquor and passion to such a degree that it ceases to care for human life and safety is a depraved mind. . . . The jury were justified in finding that [Weltz] was guilty of something more serious than culpable negligence and that his acts evinced a depraved mind in the sense in which that term is used in the statute defining third degree murder." Ibid.

The "depraved mind" contemplated by the aforementioned Minnesota statute defining a species of unintentional homicide clearly does not describe the same level of culpability as the phrase "depravity of mind" included in OCGA § 17-10-30 (b) (7) (Code Ann. § 27-2534.1). Nor, in our opinion, does the definition derived from the aforementioned 1923 Minnesota case come within the commonly understood meaning of the phrase "depravity of mind." Thus, we conclude that this definition was also incorrect.

Although, as we noted previously, instructions clarifying the statutory language of the (b) (7) aggravating circumstance need not be given absent a request for such clarifying instructions (except for the phrase "aggravated battery"); nonetheless, in the future, a defendant may make such a request; or, as here, a trial court may wish to give such clarifying instructions on its own motion; or, as in *Gates v. State,* 244 Ga. 587 (7) (261 SE2d 349) (1979) and *Stevens v. State,* 247 Ga. 698 (278 SE2d 398) (1981), the jury might request such clarifying instructions. To assist the bench and the bar in this regard, we have appended to this opinion (page 161, post) a proposed charge regarding the § (b) (7) aggravating circumstance. We caution that, in any event, only the relevant portions of the charge should be given, and that the entire proposed charge would be appropriate only if the state contends that the murder involved all three subparts of the second component of § (b)(7). See *Hance v. State,* 245 Ga. 856, 860 (3) (268 SE2d 339) (1980). See also, *Phillips v. State,* 250 Ga. 336 (297 SE2d 217) (1983); Burger v. Zant, 718 F2d 979 (11th Cir. 1983).

3. We will not rule on appellant's remaining enumerations of error, and express no opinion as to whether any of them constitute reversible error.

*Judgment reversed. All the Justices concur.*

DECIDED FEBRUARY 15, 1984 —
REHEARING DENIED MARCH 6, 1984.

*W. Benjamin Ballenger, Clifton M. Patty, Jr.,* for appellant.

*David L. Lomenick, Jr., District Attorney, David J. Dunn, Herbert E. Franklin, Jr., Assistant District Attorneys, Michael J. Bowers, Attorney General, Paula K. Smith, Staff Assistant Attorney General,* for appellee.

## APPENDIX.

The state contends that the offense of murder in this case was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or aggravated battery to the victim. The state has the burden of proving this statutory aggravating circumstance beyond a reasonable doubt. In this regard, the state must prove to your satisfaction and beyond a reasonable doubt, first, that the offense of murder was outrageously or wantonly vile, horrible or inhuman; and, second, that it involved at least one of the following: torture or depravity of mind or an aggravated battery to the victim.

I charge you that an aggravated battery occurs when a person maliciously causes bodily harm to another by depriving him of a member of his body, by rendering a member of his body useless, or by seriously disfiguring his body or a member thereof. In order to find that the offense of murder involved an aggravated battery, you must find that the bodily harm to the victim occurred before death.

I charge you that torture occurs when a living person is subjected to the unnecessary and wanton infliction of severe physical or mental pain, agony or anguish. Besides serious physical abuse, torture includes serious sexual abuse or the serious psychological abuse of a victim resulting in severe mental anguish to the victim in anticipation of serious physical harm. I charge you, however, that you would not be authorized to find that the offense of murder involved torture simply because the victim suffered pain or briefly anticipated the prospect of death. Nor would acts committed upon the body of a deceased victim support a finding of torture. In order to find that the offense of murder involved torture, you must find that the defendant intentionally, unnecessarily and wantonly inflicted severe physical or mental pain, agony or anguish upon a living victim.

I charge you that depravity of mind is a reflection of an utterly corrupt, perverted or immoral state of mind. In determining whether or not the offense of murder in this case involved depravity of mind on the part of the defendant, you may consider the age and physical characteristics of the victim and you may consider the actions of the defendant prior to and after the commission of the murder. In order to find that the offense of murder involved depravity of mind, you

must find that the defendant, as the result of his utter corruption, perversion or immorality, committed aggravated battery or torture upon a living person, or subjected the body of a deceased victim to mutilation, or serious disfigurement or sexual abuse.

I charge you that you would not be authorized to return a finding of this statutory aggravating circumstance unless you are convinced beyond a reasonable doubt, not only that the murder involved torture, or depravity of mind, or an aggravated battery to the victim, but that the murder was also outrageously or wantonly vile, horrible or inhuman. Should you be convinced beyond a reasonable doubt of the existence of this statutory aggravating circumstance, then your verdict should reflect your finding, if you so find, that the murder was outrageously or wantonly vile, horrible or inhuman; your verdict should also reflect your finding, if you so find, that the murder involved at least one of the following: torture, depravity of mind, or an aggravated battery to the victim; and your verdict should specify which — torture, depravity of mind, or an aggravated battery to the victim — was involved in the murder.

GREGORY, Justice, concurring.

In addition to the foregoing, I write separately to offer, as *obiter dicta,* a few observations with which my fellow justices do not necessarily agree at this time.

Too often, attorneys, trial courts, and, at times, this court, have failed to adequately distinguish the different kinds of jury challenges available to defendants.

For example, in this case, the defendant did not challenge his grand jury on equal protection grounds. Rather, he relied on fair-cross-section challenges derived from the Sixth Amendment to the U. S. Constitution (Code Ann. § 1-806) and from OCGA § 15-12-40 (a) (1) (Code Ann. § 59-106). Nonetheless, both parties argued vigorously the question whether purposeful discrimination had been shown, even though purposeful discrimination is not an element of any fair-cross-section challenge. Duren v. Missouri, 439 U. S. 357, 368 (99 SC 664, 58 LE2d 579) (1979).

Moreover, both parties overlooked the fact that by its clear terms, the Sixth Amendment (Code Ann. § 1-806) is inapplicable to grand juries. Thus, the state argues in this case that no *systematic* underrepresentation had been shown. However, while the underrepresentation must be shown to be systematic to establish a Sixth Amendment (Code Ann. § 1-806) violation (Duren v. Missouri, supra, 439 U. S. at 364), systematic underrepresentation is not an element of a challenge pursuant to OCGA § 15-12-40 (Code Ann. § 59-106). Instead, the defendant need only show that the *jury list* does

not fairly represent some distinctive, identifiable group in the community. *Devier v. State,* 250 Ga. 652 (300 SE2d 490) (1983).

In most cases proceeding under OCGA § 15-12-40 (Code Ann. § 59-106), once significant underrepresentation is shown, the inquiry will stop. The jury list will have to be revised. It is possible, however, that the underrepresentation of a distinct group in the community will be justified by an adequate state interest.

For example, a non-mechanically selected jury list is required to be revised not more than once every two years. OCGA § 15-12-40 (a) (1) (Code Ann. § 59-106). As the time for revision approaches, demographic changes in the county might result in some group being underrepresented on the jury list. Necessarily, 18 to 20 year olds will be underrepresented on the list, since many would not have been eligible for jury service at the time the list was last revised. Should a defendant be able to establish that 18 to 20 year olds constitute a distinct and identifiable group within the community,[1] surely the state would be allowed an opportunity to demonstrate that the underrepresentation was justified by an adequate state interest.

In other cases, underrepresentation of a group might result from legislatively established, relevant qualifications for jury duty or from reasonable exemptions therefrom. See OCGA § 15-12-1 (Code Ann. § 59-112). Again, the state should be allowed the opportunity to demonstrate that an adequate state interest justified the underrepresentation of the group on the jury list.

In this case, the state offered no justification for the underrepresentation of women on the grand jury list, nor can I think of any. Had the issues been better focused below, and had the parties recognized that concepts of purposeful discrimination and systematic exclusion were irrelevant to OCGA § 15-12-40 (Code Ann. § 59-106), the invalidity of the grand jury might have been dealt with prior to trial and a retrial avoided. Instead, this case must be reversed.

WELTNER, Justice, concurring.

I concur in the judgment, but cannot agree that the proposed charge relative to torture correctly states the law.

I am authorized to state that Presiding Justice Marshall joins in this concurrence.

---

[1] See Willis v. Zant, 720 F2d 1212 (11th Cir. 1983), which holds that whether or not a class of persons is sufficiently distinct and cognizable, for fair-cross-section analysis, is a question of fact, depending upon the time and location of the trial.